SOUTHERN UNION COMPANY,
a Delaware corporation,
Plaintiff,

v.

SOUTHWEST GAS CORPORATION,
a California corporation, et al.,
Defendants.

No. CV–99–1294–PHX–ROS.

United States District Court,
D. Arizona.

Jan. 4, 2002.

N. Warner Lee, William B. McManus, Ryley, Carlock & Applewhite, PA, Phoenix, AZ, Eric D. Hershmann, Jessica Mann, Wendy L. Mirsky, Michael M. Fay, Adam Hirshfield, Kasowitz, Benson, Torres & Friedman, LLP, New York City, Tom Q. Ferguson, Shelly L. Dalrymple, Sam P. Daniel, Jr., Doerner, Saunders, Daniel & Anderson, Tulsa, OK, Christina Carlson Dodds, Daniel W. Bishop, II, PC, Austin, TX, for Plaintiff.

Michael J. O'Connor, Richard R. Thomas, Daouglas F. Behm, Michael Scott McCoy, Michael J. Farrell, Jennings, Strouss & Salmon, PLC, Phoenix, AZ, Seth Aronson, Marc F. Feinstein, Patrick Lynch, Floy E. Andrews, O'Melveny & Myers, LLP, Los Angeles, CA, Michael R. Klein, Steven F. Cherry, Howard M. Shapiro, David P. Donovan, Wilmer, Cutler & Pickering, Washington, DC, Michael J. Bowe, Kasowitz, Benson, Torres & Friedman, LLP, New York City, Todd L. Bice, Schreck, Brignone & Godfrey, Las Vegas, NV, Thomas R. Sheets, Southwest Gas Corp., Las Vegas, NV, Paul J. Cleary, Scott R. Rowland, Boone, Smith, Davis, Hurst & Dickman, Tulsa, OK, Steve Morris, Kristina Pickering, Morris, Pickering & Sanner, Las Vegas, NV, for Southwest Gas Corp.

Mark M. Deatherage, Michael K. Kennedy, Gallagher & Kennedy, PA, Phoenix, AZ, John J. Swenson, Richard Joseph Doren, Thomas E. Holliday, Gibson, Dunn & Crutcher, LLP, Los Angeles, CA, John Henry Rule, Oliver Sterling Howard, Thomas James Kirby, David E. Keglovits, Amelia A. Fogleman, Gable & Gotwals, Tulsa, OK, for ONEOK, Inc.

Michael A. Beale, Keith Thomas Slack, Beale & Micheaels, PC, Phoenix, AZ, Samuel Brett Benham, C, Stanley Hunterton, Hunterton & Associates, Las Vegas, NV, for Thomas Hartley, Gene Dubay, and James M. Irvin.

Michael D. Kimerer, Thomas V. Rawles, Kimerer & Derrick, PLC, Phoenix, AZ, Mark M. Deatherage, Michael K. Kennedy, Tom Henze, Gallagher & Kennedy, PA, Phoenix, AZ, John Henry Rule, Oliver Sterling Howard, Thomas James Kirby, Gable & Gotwals, Tulsa, OK, for John Gaberino and Eugene N. Dubay.

Shane Ray Swindle, Brown & Bain, PA, Phoenix, AZ, John R. Hannah, Hoidal & Hannah, PLC, Phoenix, AZ, J. Daniel Campbell, III, Daniel J. O'Connor, Zahnie L. Soe Myint, Jason Edward Hunter, Bell, O'Connor & Campbell, Phoenix, AZ, for Jack D. Rose.

Christopher M. Skelly, Dennemore Craig, PC, Phoenix, AZ, for Edward Zub.

### Order

SILVER, District Judge.

Pending before the Court are fifteen motions for summary judgment and various related motions. On August 24, 2001, a hearing was held to address nine of the summary judgment motions, as well as Defendant Gaberino's Motion for Court to Apply June 21, 2001 Rulings to Him. In its September 26, 2001 Order, the Court ruled on the ten motions argued at the hearing and promised that a written opinion would follow. This is that opinion.

### Background

Southwest Gas Corporation ("Southwest") is a Nevada-based utility that distributes natural gas to customers in Nevada, California, and Arizona. ONEOK, Inc. ("ONEOK") is an Oklahoma-based utility that distributes natural gas to customers in Oklahoma and Texas. On December 14,

1998, Southwest and ONEOK entered into a merger agreement ("Merger Agreement") under which Southwest was to merge into ONEOK and Southwest's shareholders were to receive $28.50 per share. The Merger Agreement contained a "No Shopping" provision that required Southwest to enter into a "confidentiality and standstill" agreement if Southwest wished to disclose confidential information to any unsolicited third-party suitor that approached Southwest and offered a "Superior Proposal." (Merger Agreement § 5.2(a)). The Merger Agreement also required Southwest to pay ONEOK a $30 million "termination fee" if Southwest terminated the Merger Agreement based on such a proposal. (*Id.* § 8.3(a)).

Southern Union Company ("Southern Union") is a Texas-based utility that distributes natural gas to customers in Texas, Missouri, Florida, and Pennsylvania. Southern Union obtained a copy of the Merger Agreement within a week after the merger between Southwest and ONEOK was announced. (4/18/00 Bouchard [1] Depo. at 22–23). Southern Union knew that pursuant to the terms of the Merger Agreement, "an uninvited bidder would have to enter into a confidentiality agreement essentially identical to the one between Southwest and ONEOK." (*Id.* at 21).

On February 1, 1999, Southern Union presented its own merger offer to Southwest. (2/1/99 Kelley [2] Letter to Maffie [3]). Southern Union was prepared "to execute an agreement identical in all material respects" to the Merger Agreement entered into by ONEOK and Southwest and to offer Southwest $32 per share, as compared with ONEOK's offer of $28.50 per share. (*Id.*).

On February 21, 1999, the Southwest Board of Directors ("Board") [4] held a special meeting "to determine whether to provide information to or enter into discussions with Southern Union ... regarding its offer." (2/21/99 Minutes). At that meeting, the Southwest Board resolved that Southern Union's merger offer was a "Superior Proposal" to the ONEOK proposal and authorized Southwest's officers to enter into discussions with Southern Union "upon execution by [Southern Union] of a confidentiality agreement." (*Id.; see* 4/15/99 Cortez Depo. at 113). That same day, Southern Union and Southwest executed a confidentiality and standstill agreement ("Standstill Agreement") essentially identical to the one between Southwest and ONEOK.

Between February and the end of April 1999, Southern Union and Southwest exchanged drafts of a proposed merger agreement that would have supplanted the Merger Agreement between ONEOK and Southwest. (*See, e.g.,* 3/8/99 & 4/22/99 Bouchard Letters to Lossing [5]). However, Southern Union and Southwest were unable to agree on several terms, including whether Southern Union would pay the

---

1. Stephen Bouchard, an attorney with Fleischman and Walsh, LLP, represented Southern Union during its negotiations with Southwest regarding Southern Union's merger proposal.

2. Peter Kelley was the President and Chief Operating Officer of Southern Union.

3. Michael Maffie was a Director on the Southwest Board of Directors and also served as President and Chief Executive Officer for Southwest.

4. The Southwest Board was comprised of the following individuals: George Biehl, Manuel Cortez, Thomas Hartley, Lloyd Dyer, Michael Jager, Leonard Judd, James Kropid, Maffie, Carolyn Sparks, Robert Sundt, and Terrance Wright.

5. Frances Lossing, an attorney with O'Melveny & Myers, LLP, represented Southwest during its negotiations with Southern Union regarding Southern Union's merger proposal.

required $30 million termination fee directly to ONEOK or whether the money would be placed in escrow. (4/22/99 Bouchard Letter to Lossing). The parties also could not agree on the inclusion of a liquidated damages provision. (4/18/00 Bouchard Depo. at 184).

On April 5, 1999, James Irvin, a Commissioner with the Arizona Corporation Commission ("ACC"), wrote a letter ("Irvin Letter") to Maffie and Hartley of Southwest. (4/5/99 Irvin Letter). The Irvin Letter generally advised Maffie and Hartley about the factors that the ACC would consider in evaluating applications for regulatory approval, which Southern Union and ONEOK would need to file and have approved before they could merge with Southwest. (*Id.*). In addition, the Irvin Letter stated: "I also have spent a considerable amount of time discussing these factors with my colleagues at the Nevada and California utility commissions, and advise you that they share my concerns." (*Id.*).[6] The Irvin Letter did not expressly state that a ONEOK merger was favored, nor did it disparage Southern Union. (*Id.*).

On April 25, 1999, the Southwest Board held a meeting to consider a revised ONEOK offer of $30 per share. (4/25/99 Minutes). The Southwest Board resolved that ONEOK's offer should be accepted and Southern Union's offer should be rejected. (*Id.*). On April 27, 1999, Southern Union increased its bid to $33.50 per share. (4/27/99 Kelley Letter). On May 4, 1999, the Southwest Board voted to reject Southern Union's new offer. (5/4/99 Minutes). Several months later on January 21, 2000, Larry Brummett, ONEOK's Chief Executive Officer, sent a letter to Southwest indicating that, pursuant to the terms of the Merger Agreement, ONEOK did not intend to consummate the merger with Southwest. (1/21/00 Brummett Letter).

## Procedural History

As a result of these failed merger attempts, the parties filed five lawsuits in three states. Southwest filed the first action, CV–00–452–PHX–ROS, against Southern Union in Nevada on April 30, 1999 ("Nevada Action"). Southern Union asserts counterclaims against Southwest in the Nevada Action. ONEOK filed the second action, CV–00–1812–PHX–ROS, against Southern Union in Oklahoma on May 5, 1999 ("First Oklahoma Action"). Southern Union asserts counterclaims against ONEOK in the First Oklahoma Action. Southern Union filed the third action, CV–99–1294–PHX–ROS, against Southwest, ONEOK, and numerous individual defendants in Arizona on July 19, 1999 ("First Arizona Action"). ONEOK asserts counterclaims against Southern Union in the First Arizona Action. ONEOK filed the fourth action, CV–00–1775–PHX–ROS, against Southwest in Oklahoma on January 21, 2000 ("Second Oklahoma Action"). No counterclaims are asserted in the Second Oklahoma Action. Southwest filed the fifth action, CV–00–119–PHX–ROS, against ONEOK and Southern Union on January 24, 2000 ("Second Arizona Action"). No counterclaims are asserted in the Second Arizona Action.

In an Order dated December 15, 2000, the Court granted in part and denied in part portions of several motions to dismiss filed in the First Arizona Action. (Doc. # 556). Subsequently, the five actions were consolidated for purposes of discovery on March 27, 2001 and June 5, 2001. (Doc. # 750 & # 939). In the June 5, 2001 Order, the Court also aligned the parties with respect to the various claims and

---

**6.** The utility commissions Irvin referred to are the Public Utilities Commission of Nevada ("PUCN") and the California Public Utilities Commission ("CPUC").

counterclaims asserted in the five actions. (Doc. # 939).

In an Order dated June 21, 2001, the Court granted in part and denied in part the remaining portions of the motions to dismiss filed in the First Arizona Action. (Doc. # 1011). The Court also issued rulings regarding the law governing most of the remaining claims, but did not do so for certain claims that appeared to be duplicative of other claims. (*Id.*). On July 31, 2001, the Court issued an Amended Order that did not alter the substantive determinations set forth in its June 21, 2001 Order. (Doc. # 1185). The tables contained on pages 50 through 55 of the July 31, 2001 Order set forth the claims remaining, the applicable law, and the alignment of the parties. (*See id.*).

## Discussion

### I. STANDARD OF REVIEW

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) (1996); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Jesinger v. Nevada Fed. Credit Union,* 24 F.3d 1127, 1130 (9th Cir.1994). Substantive law determines which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jesinger,* 24 F.3d at 1130. In addition, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The dispute must be genuine, that is, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548. Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548; *see Citadel Holding Corp. v. Roven,* 26 F.3d 960, 964 (9th Cir.1994). The moving party need not disprove matters on which the opponent has the burden of proof at trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

Furthermore, the party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Brinson v. Linda Rose Joint Venture,* 53 F.3d 1044, 1049 (9th Cir.1995). There is no issue for trial unless there is sufficient evidence favoring the non-moving party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. However, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

### II. SOUTHWEST'S AND MAFFIE'S MOTIONS FOR SUMMARY JUDGMENT ON SOUTHERN UNION'S FRAUDULENT INDUCEMENT CLAIM

Count Three of Southern Union's Second Amended Complaint in the First Arizona Action is a fraudulent inducement claim against Southwest and Maffie that the Court has determined shall be treated as a counterclaim in the Nevada Action

and governed by California law. (*See* 6/21/01 Order). In Count Three, Southern Union alleges that Maffie and Southwest fraudulently induced Southern Union to enter into the Standstill Agreement by falsely stating that Southwest would conduct a good faith evaluation of Southern Union's merger offer. (Second Am. Compl. ¶¶ 50–52).[7]

In its Motion for Summary Judgment Re: Preclusive Effect of February 21, 1999 Confidentiality and Standstill Agreement (Doc. # 802), and in a separate Motion for Summary Judgment Re: Fraudulent Inducement and Punitive Damages (Doc. # 1034), Southwest argues that Southern Union cannot prevail on its fraudulent inducement claim because: (1) Southern Union was not induced by Maffie's statements to sign the Standstill Agreement; (2) Southern Union could not have relied on Maffie's statements because the Standstill Agreement provides that any oral representations will have no effect; (3) there is no evidence that, at the time the parties entered into the Standstill Agreement, Southwest did not intend to perform a good faith evaluation of Southern Union's offer; and (4) Southern Union cannot prove fraud by clear and convincing evidence, as required to recover punitive damages under California law.[8] Similarly, Maffie argues in his Motion for Summary Judgment (Doc. # 1236) that Southern Union cannot show that Maffie made a false representation on which Southern Union justifiably relied and that Southern Union's claimed damages are, in any event, too speculative.

In its September 26, 2001 Order, the Court granted Southwest's and Maffie's motions to the extent that Southern Union is seeking "lost profit" damages for Southern Union's inability to make a tender offer to Southwest's shareholders, but denied the motions to the extent that Southern Union is seeking out-of-pocket and punitive damages on Count Three.[9]

### A. Fraudulent Inducement

 " 'Promissory fraud' is a subspecies of the action for fraud and deceit." *Lazar v. Superior Ct.*, 12 Cal.4th 631, 49 Cal.Rptr.2d 377, 381, 909 P.2d 981 (1996). "The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to *induce reliance*; (d) justifiable reliance; and (e) resulting damage." *Id.*, 49 Cal.Rptr.2d at 380, 909 P.2d 981 (internal quotations and citations omitted).

 Southern Union must prove each of these elements to prevail on its claim for fraudulent inducement. *See Kruse v.*

---

7. Southern Union also alleges that Maffie stated that Southwest would not attempt to handicap the regulatory approval of Southern Union's proposal. (*See* 11/27/00 Kelley Depo. at 148). Kelley stated during his deposition, however, that apart from the assurance that Southern Union's proposal would be fairly reviewed, he could not recall that any other statements were made to induce him to sign the Standstill Agreement. (11/28/00 Kelley Depo. at 497). In any event, a promise that Southwest would not attempt to handicap the regulatory approval of Southern Union's proposal, if made, is simply another promise to conduct a good faith evaluation of the merger proposal.

8. Southwest additionally argues that the parol evidence rule bars the use of Maffie's statements. The Court previously resolved this issue against Southwest and it will not be revisited. (*See* 6/21/01 Order).

9. The decision on Southwest's Motion for Summary Judgment Re: Preclusive Effect of February 21, 1999 Confidentiality and Standstill Agreement is applicable to Maffie and Defendant Jack Rose, who formerly served as an assistant to Commissioner Irvin, because Maffie and Rose joined the motion.

*Bank of Am.*, 202 Cal.App.3d 38, 60–61, 248 Cal.Rptr. 217 (1988). Moreover, under California law, Southern Union must prove its damages with "reasonable certainty." *See, e.g., Mann v. Jackson*, 141 Cal.App.2d 6, 296 P.2d 120, 123 (1956). In addition, Southern Union may recover punitive damages only if it proves by clear and convincing evidence that Defendants Maffie and Southwest are guilty of oppression, fraud, or malice. *See* Cal. Civ.Code § 3294(a); *Basich v. Allstate Ins. Co.*, 87 Cal.App.4th 1112, 105 Cal.Rptr.2d 153, 158 (2001) (applying the standard in the context of summary judgment).

### 1. Misrepresentation, knowledge of falsity, and intent to defraud

Southern Union alleges that Maffie, and hence Southwest, promised Southern Union that Southwest would conduct a good faith evaluation of Southern Union's merger offer. Southern Union claims that when Maffie made this promise, he knew it was false and he did not intend to fulfill it. Southern Union also claims that it is entitled to punitive damages because Southwest and Maffie acted maliciously and fraudulently with the specific intent to oppress and harm Southern Union.

The undisputed facts establish that Southwest committed to Southern Union, both orally and contractually, that its merger offer would be evaluated in good faith. Both Judd and Sundt of the Southwest Board testified that Southwest made such a commitment. (1/5/00 Judd Depo. at 144–45; 3/13/01 Sundt Depo. at 87–88). In fact, Sundt testified that the Southwest Board specifically told Southern Union that its offer would be evaluated in good faith. (3/13/01 Sundt Depo. at 87–88). Further, at a minimum, there is a genuine issue of material fact whether Maffie, as a

Southwest representative, made a good faith representation because Kelley testified that Maffie said: "Look, just relax. You're going to get, you know, a fair review of your proposal, but you need to sign the standstill agreement." (11/28/00 Kelley Depo. at 496–97).

 "A promise of future conduct is actionable as fraud only if made without a present intent to perform." *Magpali v. Farmers Group, Inc.*, 47 Cal.App.4th 1024, 55 Cal.Rptr.2d 225, 231 (1996). "[I]f [a] plaintiff adduces no further evidence of fraudulent intent than proof of nonperformance of an oral promise, he will never reach a jury." *Tenzer v. Superscope, Inc.*, 39 Cal.3d 18, 216 Cal.Rptr. 130, 137, 702 P.2d 212 (1985).

> In proving fraud, however, rarely does a plaintiff have direct evidence of a defendant's fraudulent intent. Therefore, the subsequent conduct of a defendant, such as his failure to immediately carry out his pledge, has some evidentiary value to show that a defendant made the promise without the intent to keep the obligation.

*Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*, 235 Cal.App.3d 1220, 1 Cal. Rptr.2d 301, 311 (1991). Conversely, the Ninth Circuit has held that a party's "initial performance in accordance with its promises negates any possible inference of fraud." *Kaylor v. Crown Zellerbach, Inc.*, 643 F.2d 1362, 1368 (9th Cir.1981).

 There are genuine issues of material fact regarding whether Southwest intended to perform a good faith evaluation of Southern Union's offer at the time the Standstill Agreement was executed. After Southern Union made its merger offer on February 1, 1999, and before it signed the Standstill Agreement on February 21, 1999, Edward Zub [10] of Southwest alleged-

---

**10.** Edward Zub is the Senior Vice President/Regulation and Product Pricing of Southwest.

ly misrepresented Southern Union's debt-to-equity ratio to ACC Commissioner Carl Kunasek and his assistant, Jerry Porter, during a meeting held February 10, 1999. (7/13/00 Zub Depo. at 130). Zub stated that if Southern Union financed the entire acquisition with debt, "the cap structure would be 88/12." (*Id.*). Zub also told Kunasek and Porter that Southern Union had a "rocky situation" and "customer problems" in Missouri, that Southern Union had cut forces or management in Missouri, and that a consumer advocate group was trying to levy a fine against Southern Union. (*Id.* at 133–34; *see* 4/17/01 Porter Depo. at 534). Zub also told Greg Patterson of the Arizona Residential Utility Consumer Office on February 12, 1999, that Southern Union's debt-to-equity ratio would be 90/10. (10/28/99 Patterson Depo. at 24). Likewise, Zub told Patterson that Southern Union had service problems in Missouri and that Zub was concerned that Southern Union would eliminate local Southwest management or dismantle and sell off parts of the company. (*Id.*).

Other evidence may create the inference that Southwest did not intend to merge with Southern Union even if Southern Union's offer was superior. Southwest, through its counsel O'Melveny and Myers, retained Sitrick and Company ("Sitrick"), a public relations firm, that employed a "wheel of pain" strategy. (12/6/00 Sitrick[11] Depo. at 119, 222). According to Sitrick, "[t]he wheel of pain is getting in the public domain information, factual information, about someone who is on the other side who is stirring up the waters that is factual but may not be flattering but is also relevant to the matter at hand." (*Id.* at 222). As of April 21, 1999, Sitrick had no concerns about Southern Union's ability to finance the proposed merger. (*Id.* at 125–26). Nevertheless, an undated memorandum ("Sitrick Memo") entitled "Southwest Gas Corporation (SWX) Merger Synopsis" was prepared by Sitrick. It outlined a "wheel of pain" strategy for convincing Southwest's shareholders to accept ONEOK's offer, and its stated purpose was to persuade Southwest shareholders that Southern Union could not finance the proposed merger on terms acceptable to regulators. (Sitrick Memo at 5).[12]

As a result, there are genuine issues of material fact regarding the first three elements of Southern Union's fraudulent inducement claim. A jury could reasonably find that: (1) Maffie and the Southwest Board falsely represented to Southern Union that Southwest would conduct a good faith evaluation of Southern Union's merger proposal; (2) Maffie and Southwest knew that these representations were false; (3) Maffie and Southwest did not intend for a good faith evaluation to be conducted; and (4) Maffie and Southwest made the misrepresentations for the purpose of inducing Southern Union to sign the Standstill Agreement and forgo alternative takeover options.

**2. Justifiable reliance**

Southwest contends that Southern Union knew that it would have to enter into

---

**11.** Michael Sitrick is a principal of Sitrick & Company.

**12.** Lewis Phelps, a Sitrick and Company representative, repeatedly invoked the Fifth Amendment at his deposition when he was questioned about his relationship with Southwest. (12/4/00 Phelps Depo. at 26–27). Under the circumstances of this case, a jury may draw an adverse inference against Southwest based on Phelps' invocation of his Fifth Amendment privilege not to testify. *See, e.g., Brink's, Inc. v. City of N.Y.*, 717 F.2d 700, 707 (2d Cir.1983) (permitting jury to draw adverse inference against corporate defendant from invocation of Fifth Amendment by former employee of corporation).

the Standstill Agreement based on the provisions of the Merger Agreement between Southwest and ONEOK and for Southern Union to be able to perform due diligence and formulate a competitive merger offer. Thus, Southwest argues that Southern Union would have entered into the Standstill Agreement regardless of whether Maffie made any assurances about a good faith evaluation. Southwest also contends that Southern Union's reliance on Maffie's statement, if any, was not justifiable.

"Justifiable reliance is an essential element of a claim for fraudulent misrepresentation[.]" *Guido v. Koopman*, 1 Cal.App.4th 837, 2 Cal.Rptr.2d 437, 440 (1991). "Reliance exists when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct which altered his or her legal relations, and when without such misrepresentation or nondisclosure he or she would not, in all reasonable probability, have entered into the contract or other transaction." *Alliance Mortgage Co. v. Rothwell*, 10 Cal.4th 1226, 44 Cal.Rptr.2d 352, 900 P.2d 601, 608–09 (1995); *see Engalla v. Permanente Med. Group, Inc.*, 15 Cal.4th 951, 64 Cal.Rptr.2d 843, 859, 938 P.2d 903 (1997). In other words, a party must be "thoroughly induced" by a fraudulent misrepresentation that, "judging from the ordinary experience of mankind, in the absence of it he would not, in all reasonable probability, have entered into the contract or other transaction." *Spinks v. Clark*, 147 Cal. 439, 82 P. 45, 47 (1905) (citation omitted). Reliance upon the misrepresentation, however, does not need to "be the sole or even the predominant or decisive factor in influencing" the decision to enter a contract, but rather, it needs to be only a "substantial factor" in the decision. *Id.* (quoting the Restatement (Second) of Torts, § 546 cmt. b).

"[T]he reasonableness of the reliance is ordinarily a question of fact," but "whether a party's reliance was justified may be decided as a matter of law if reasonable minds can come to only one conclusion based on the facts." *Guido*, 2 Cal.Rptr.2d at 440. Reliance upon statements that contradict a subsequent written agreement may not be justifiable. *See Slivinsky v. Watkins–Johnson Co.*, 221 Cal.App.3d 799, 270 Cal.Rptr. 585, 589 (1990). Nevertheless, "[u]nder California law, a contract integration provision stating that all representations are contained therein does not bar a claim of fraudulent inducement by parol misrepresentations, regardless of the level of sophistication of the parties." *California State Auto. Ass'n Inter–Ins. Bur. v. Policy Mgmt. Sys. Corp.*, No. C–93–4232–CW, 1996 WL 45280, at *11 (N.D.Cal. Jan.9, 1996) (citing *Ron Greenspan Volkswagen, Inc. v. Ford Motor Land Dev. Corp.*, 32 Cal.App.4th 985, 38 Cal.Rptr.2d 783 (1995)); *see Ron Greenspan Volkswagen, Inc.*, 38 Cal. Rptr.2d at 789; *Sherman v. Mut. Benefit Life Ins. Co.*, 633 F.2d 782, 785 (9th Cir. 1980) ("Noncontradictory parol evidence is admissible to show fraud even though the termination clause is integrated."); *Airs Int'l, Inc. v. Perfect Scents Distribs., Ltd.*, 902 F.Supp. 1141, 1147 (N.D.Cal.1995) (merger clause does not preclude evidence of fraudulent inducement); *Fed. Reserve Bank of S.F. v. HK Sys., Eaton Corp.*, No. C–95–1190–MHP, 1997 WL 227955, at *5 (N.D.Cal. Apr.24, 1997). The existence of an integration provision does not render reliance on the parol statements unreasonable. *California State Auto. Ass'n Inter–Ins. Bur.*, 1996 WL 45280 at *11; *Ron Greenspan Volkswagen, Inc.*, 38 Cal. Rptr.2d at 789.

There are genuine issues of material fact regarding whether Southern Union would have entered into the Standstill

Agreement if it had known that Southwest did not intend to evaluate its merger offer in good faith. Some evidence presented suggests that Southern Union gave serious consideration to pursuing a tender offer to Southwest's shareholders, but instead opted to obtain due diligence. For example, Kelley testified that if Southern Union had "known of the intent of Southwest management to engage in acts aimed at undermining and defeating Southern Union's financially superior offer, [he] would have never signed the Standstill Agreement. Instead, Southern Union would have made its offer public and pursued its offer to purchase Southwest directly with Southwest's shareholders." (5/9/01 Kelley Aff. ¶ 5).

Similarly, John Brennan, Vice Chairman of Southern Union, testified that Southern Union forfeited its right to pursue a tender offer, a proxy fight, media campaigns, and the formation of Southwest shareholder voting groups when it entered into the Standstill Agreement. (6/19/01 Brennan Aff. ¶ 2). Brennan also testified that even though "Southern Union's general course of business is to engage in friendly negotiations[,]" it would not have given up its right to pursue a hostile course if it had known that its merger proposal would not receive fair consideration. (*Id.* ¶ 3).

John Cavalier of Donaldson, Lufkin, and Jenrette ("DLJ"), Southern Union's financial advisor, testified that Southern Union was advised by its counsel not to enter into the Standstill Agreement because "it kept us from going hostile, but we signed it in order to be permitted to get the due diligence done." (10/30/01 Cavalier Depo. at 70–71). John Rice of DLJ testified that a tender offer was discussed and documents were prepared in relation to a proposed tender offer. (6/12/01 Rice Depo. at 354). Rice also testified that Southern Union decided not to go forward with a tender offer after Southwest agreed to sign the Standstill Agreement. (*Id.* at 354–55).

However, George Lindemann, Southern Union's Chairman and Chief Executive Officer, testified that a tender offer was "not the route we would have gone." (12/13/00 Lindemann Depo. at 188). Likewise, Ronald Endres, Executive Vice President of Southern Union, testified that Southern Union did not seriously consider a tender offer. (11/8/00 Endres Depo. at 147).

Outside counsel for Southern Union, Aaron Fleischman, testified that Southern Union does not generally make tender offers when the management of the other corporation does not want to be sold to Southern Union. (11/28/00 Fleischman Depo. at 441–42). Even Kelley could not recall any tender offers being made since he joined Southern Union in 1990. (11/28/00 Kelley Depo. at 285).

In addition, Cavalier testified that the only reason Southern Union signed the Standstill Agreement was that it expected Southwest to conduct a good faith evaluation (10/31/00 Cavalier Depo. at 501). He also opined that Southern Union would not have been able to afford a hostile tender offer, and that he had never seen a successful tender offer in the utility industry (10/30/00 Cavalier Depo. at 415–16).

Regarding the prevalence of confidentiality and standstill agreements in merger transactions, Robert Yolles, a ONEOK attorney, testified that "[i]n deals for public companies, it would be extraordinary for there not to be" a confidentiality and standstill agreement. (5/30/01 Yolles Depo. at 91). Likewise, Joris Hogan, an attorney hired to advise Southern Union's financial advisor, testified that confidentiality and standstill agreements are customary. (5/3/01 Hogan Depo. at 331).

Based on the evidence discussed above, there are genuine issues of material fact regarding whether Southern Union would

have entered into the Standstill Agreement if it had known that it would not receive a good faith evaluation of its merger offer. The integration clause in the Standstill Agreement does not alter this conclusion.

The Standstill Agreement provides, in pertinent part:

Each party hereto agrees that unless and until a definitive agreement with respect to the Proposal referred to in the first paragraph of the Agreement has been executed and delivered, neither it nor the other party hereto will be under any legal obligation of any kind whatsoever with respect to such a transaction by virtue of the Agreement or any written or *oral expression with respect to such a transaction by any of its Representatives* or by any Representatives thereof except, in the case of the Agreement, for the matters specifically agreed to herein.

(Standstill Agreement ¶ 10) (emphasis added). Although Southern Union necessarily agreed that Southwest would not be obligated with respect to any oral expressions regarding the proposed merger, such an agreement does not preclude proof that Southern Union justifiably relied on Maffie's alleged representations, particularly where, as here, the representations became contractual obligations. *See California State Auto. Ass'n Inter–Ins. Bur.,* 1996 WL 45280 at *11; *Ron Greenspan Volkswagen, Inc.,* 38 Cal.Rptr.2d at 789.

### 3. Damages for fraudulent inducement

Southern Union claims that it would not have entered into the Standstill Agreement and would have made a successful and profitable tender offer directly to Southwest's shareholders if it had known that it would not receive a good faith evaluation of its merger offer. To prevail on this claim, Southern Union must prove the tender offer to Southwest's shareholders would have succeeded. In addition, Southern Union must establish damages from the inability to make a tender offer.

▇ In California, damages must be proven with "reasonable certainty" in both contract and tort actions. *See Vestar Dev. II, LLC v. General Dynamics Corp.,* 249 F.3d 958, 961 (9th Cir.2001) (contract action); *Mann v. Jackson,* 141 Cal.App.2d 6, 296 P.2d 120, 123 (1956) ("It is well established that damages may be awarded for loss of profits where such profits can be shown with a reasonable degree of certainty, whether the action be for tort or for breach of contract."). Thus, Southern Union must prove its damages, including any "lost profit" damages, with reasonable certainty.

### a. lost profit damages from Southern Union's inability to make a tender offer to Southwest shareholders

Southern Union argues that its tender offer would have been accepted by the Southwest shareholders because Southern Union's per-share price was higher than ONEOK's. Maffie and Southwest dispute that Southern Union can show that it was "reasonably certain" to succeed on a tender offer to Southwest's shareholders.[13] In particular, Southwest contends that among the numerous obstacles to a successful Southern Union tender offer were the substantial "defensive mechanisms" that the Southwest Board would have de-

---

**13.** Southwest does not address the damages element in its Motion for Summary Judgment Re: Southern Union's Fraudulent Inducement Claim and Demand for Punitive Damages. As discussed below, however, Southwest makes a damages argument in its motions regarding Southern Union's breach of contract claims. Additionally, Maffie's arguments concerning damages apply as well to Southern Union's claims against Southwest.

ployed to defeat a "hostile" Southern Union takeover.

As discussed above, the question of whether Southern Union would have made a tender offer is genuinely disputable, but assuming it would have made one, Southern Union must also show that Southwest's shareholders were reasonably certain to have accepted the offer. Toward that end, Southern Union argues that the higher dollar value of its offer establishes that it was *reasonably assured* of acceptance. Southwest, however, contends that the defensive mechanisms available to the Southwest Board created insurmountable obstacles to a successful Southern Union takeover. At the August 24, 2001 hearing, the parties argued their positions at length. (8/24/01 Hr'g Tr. at 11–35).

Southern Union contends that once Southwest entered into the merger agreement with ONEOK, Southwest was effectively on the "auction block." *See Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 182 (Del.1986). As a result, the Southwest Board could not have availed itself of "poison pills" to defeat a Southern Union tender offer, but would have been duty-bound to obtain the best value for Southwest's shareholders. *See id.* ("The duty of the board had thus changed from the preservation of Revlon as a corporate entity to the maximization of the company's value at a sale for the stockholders' benefit. . . . The whole question of defensive measures [thus] became moot."). Southern Union insists that in the absence of the defensive mechanisms, it was reasonably assured of succeeding on a tender offer to Southwest's shareholders.

Southwest has emphasized the number and strength of defensive mechanisms at the Southwest Board's disposal, citing testimony from Southern Union's own expert to establish that Southwest's defensive mechanisms were especially potent. (8/24/01 Hr'g Tr. at 17–19). Southwest also argued that because the *Revlon* duties that Southern Union attempts to rely on are duties that the Southwest Board owes to its shareholders—not to outside bidders—the existence of such duties would have had no bearing on a Southern Union takeover attempt. (*Id.* at 35).

The law establishes that the Merger Agreement between Southwest and ONEOK triggered the Southwest Board's *Revlon* duties to its shareholders. Thus, the Southwest Board had a duty to obtain the best value for its shareholders and could not have invoked the various defensive mechanisms to the extent that these were inconsistent with its *Revlon* duties. *See Paramount Communications, Inc. v. QVC Network, Inc.,* 637 A.2d 34, 48 (Del.1994).[14] Under these circumstances, Southwest cannot as a matter of law rely on the existence of its defensive mechanisms as obstacles to a successful Southern Union tender offer.

Even without the defensive mechanisms, however, Southern Union has not presented sufficient evidence to establish that it would have been *reasonably certain* to succeed on and profit from a tender offer to Southwest's shareholders. *See Vestar,* 249 F.3d at 961; *Mann,* 296 P.2d at 123. Indeed, Southern Union offers no evidence regarding the specific terms of such a tender offer.[15] Consequently, the

**14.** While Southwest is correct that a board owes *Revlon* duties to its *shareholders,* in both *Revlon* and *Paramount,* it was the spurned *bidders* who sought and won injunctions against the use of the defensive mechanisms.

**15.** Indeed, at the October 19, 2001 hearing on the remaining six pending motions for summary judgment, Southern Union acknowledged that it never even came close to making a tender offer: "There's no actual threat that we were going to start a proxy solicitation. There's no evidence that we did start a proxy

Court cannot speculate whether the tender offer would have been accepted or whether, and to what extent, it would have been profitable. *See Computer Sciences, Corp. v. Computer Assocs., Int'l, Inc.,* Nos. CV 98–1374–WMB–SHX, CV 98–1440–WMB–PHX, 1999 WL 675446, at *24 (C.D.Cal. Aug.12, 1999) ("CA's tender offer was nowhere near the verge of closing either at the time of [Defendants'] alleged interference or upon the tender offer's expiration, and whether CA's tender offer would have closed absent the alleged interference is anybody's guess.").

Southern Union cannot recover speculative lost profit damages for its inability to make a tender offer to the Southwest shareholders.

### b. reliance damages

■ Although Maffie and Southwest are correct that Southern Union has not met its burden to preclude summary judgment with respect to lost profit damages from its inability to make a tender offer, it is incorrect that Southern Union cannot prove any damages on its fraudulent inducement claim. Under California law, a defrauded party is entitled to the actual damages resulting from its reliance on the defendant's fraudulent promise. Indeed, Southern Union can seek all of its "out-of-pocket" or "reliance" damages—that is, "time spent, expenses incurred, *opportunities foregone,* or perhaps harm to its reputation." *Vestar,* 249 F.3d at 962 (emphasis added). Although Southern Union has presented insufficient evidence to establish lost profit damages from its inability to make a tender offer ("its opportunities

foregone") with reasonable certainty, Southern Union may seek out-of-pocket reliance damages (time spent and expenses incurred) to the extent that it can establish such damages with reasonable certainty.

Thus, Southern Union has withstood summary judgment on its fraudulent inducement claims with respect to its actual out-of-pocket reliance damages.

### c. benefit-of-the-bargain damages: lost profit damages from Southern Union's failed merger with Southwest

At the August 24, 2001 hearing, Southern Union argued two ways to prove damages on the fraudulent inducement claim under California law. (8/24/01 Hr'g Tr. at 28–30).[16] First, proof can be made by showing that, absent Southwest's alleged fraudulent inducement, Southern Union would not have entered into the Standstill Agreement, and a Southern Union tender offer to Southwest's shareholders would have occurred, succeeded, and been profitable. *(Id.).* Such lost profit damages from Southern Union's inability to make a tender offer are typical tort damages that would make Southern Union whole by putting it in the position it would have been in absent Southwest's alleged fraudulent inducement.[17]

Second, relying on *Alliance Mortgage Co. v. Rothwell,* 10 Cal.4th 1226, 44 Cal. Rptr.2d 352, 900 P.2d 601 (1995) and Cal. Civ.Code § 3333 (damages for torts in general) and § 1709 (damages for deceit), Southern Union claims that "benefit of the bargain damages are also available under fraud." *(Id.* at 29). Under this damages

---

solicitation. There's no evidence that we did a tender offer. None of that happened." (10/19/01 Hr'g Tr. at 27).

**16.** Southern Union also submitted materials regarding "fraud damages" that quoted *Alliance Mortgage Co. v. Rothwell,* 10 Cal.4th 1226, 44 Cal.Rptr.2d 352, 900 P.2d 601 (1995) and Civil Code §§ 1709 and 3333.

Southwest filed a Response on September 12, 2001 (Doc. # 1377), and Southern Union filed a Reply on September 18, 2001 (Doc. # 1378).

**17.** As discussed above, however, Southern Union cannot prove such lost profit damages with reasonable certainty as a matter of law.

theory, Southern Union could prove its damages by showing that it would have merged with Southwest and profited from the merger if, as allegedly promised, Southwest had conducted a good faith evaluation of Southern Union's merger offer. This theory seems inconsistent with a fraudulent inducement claim, however, because justifiable reliance is an essential element of the claim; such reliance exists when, absent the misrepresentation, the allegedly defrauded party would *not* have entered into the bargain. *See, e.g., Engalla v. Permanente Med. Group, Inc.*, 15 Cal.4th 951, 64 Cal.Rptr.2d 843, 859, 938 P.2d 903 (1997). Here, Kelley testified that if Southern Union had known that Southwest would not evaluate Southern Union's offer in good faith, Southern Union would *not* have entered into the Standstill Agreement. (Kelley Aff. ¶ 5). Southern Union acknowledges that "it may seem slightly inconsistent that fraud nullifies a contract and then provides you with benefit of the bargain damages," but argues that "we live with that slight inconsistency because [we are] trying to punish the fraud-feasor and [we are] trying to *make the victim of the fraud whole.*" (8/24/01 Hr'g Tr. at 29) (emphasis added). Damages that . *make Southern Union whole,* however, are technically tort damages, not benefit-of-the-bargain damages.

In its Response, Southwest argues that Southern Union misstates California law. (Resp. at 5). Relying on two California Supreme Court cases [18] and two California Court of Appeal cases from the Fifth and Fourth Districts,[19] Southwest argues that benefit-of-the-bargain damages are available "only when the fraud is committed by

a fiduciary." (*Id.* at 7). Southwest further argues that because it was not Southern Union's fiduciary, Southern Union's "fraud damages are restricted to any out-[of]-pocket losses it suffered in reliance on Southwest's alleged fraud." (*Id.* at 5).

In its Reply, Southern Union contends that it "is only under [Cal. Civ.Code § 3343]—which applies to fraud cases involving property transactions—that a party must demonstrate a 'fiduciary duty' in order to recover 'benefit-of-the-bargain' damages." (Reply at 5). Relying on *Alliance Mortgage* and two California Court of Appeal cases from the First District,[20] Southern Union claims that it is entitled to benefit-of-the-bargain damages under Civil Code §§ 1709 and 3333. (*Id.* at 3–4).

It is not surprising that the parties reach different conclusions regarding the measure of damages available to Southern Union because "[p]art of the difficulty in analysis of [California] law in this type of case arises out of the veritable *gallimaufry of confusing rules* gleaned from different types of actions." *Overgaard v. Johnson,* 68 Cal.App.3d 821, 825, 137 Cal.Rptr. 412 (1977) (emphasis added). Some of the cases are based on contract, others on fraud, and still others on unjust enrichment. *Id.* In addition, courts and litigants often consider the out-of-pocket and the benefit-of-the-bargain rules as "the sole antagonists on the battlefield of damages when at times neither is truly applicable." *Id.*

The Court finds, however, that Southern Union may not recover benefit-of-the-bargain damages on its fraudulent inducement

---

**18.** *Gagne v. Bertran,* 43 Cal.2d 481, 275 P.2d 15 (1954) and *Gray v. Don Miller & Associates, Inc.,* 35 Cal.3d 498, 198 Cal.Rptr. 551, 674 P.2d 253 (1984).

**19.** *Christiansen v. Roddy,* 186 Cal.App.3d 780, 231 Cal.Rptr. 72 (1986) and *Kenly v. Ukega-*

*wa,* 19 Cal.Rptr.2d 771, 19 Cal.Rptr.2d 771 (Ct.App.1993).

**20.** *Pepitone v. Russo,* 64 Cal.App.3d 685, 134 Cal.Rptr. 709 (1976) and *Salahutdin v. Valley of California, Inc.,* 24 Cal.App.4th 555, 29 Cal.Rptr.2d 463 (1994).

claim under the majority view of California courts.

### i. Cal. Civ.Code §§ 3333 and 1709

Cal. Civ.Code §§ 3333 and 1709, enacted in 1872,[21] set forth the damages available for torts in general: "For the breach of an obligation not arising from contract, the measure of damages ... is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." Cal. Civ.Code § 3333; and for deceit: "One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage that he thereby suffers." Cal. Civ.Code § 1709.[22]

As discussed above, Southern Union contends that Southwest's fraudulent inducement allows recovery, pursuant to Civil Code §§ 3333 and 1709, of benefit-of-the-bargain damages, i.e., the difference between the actual value of what Southern Union received and what it expected to receive (a good faith evaluation of its merger proposal). *See Overgaard*, 68 Cal. App.3d at 825, 137 Cal.Rptr. 412. Southwest contends, however, that Southern Union is limited to actual out-of-pocket damages, i.e., the difference between the actual value Southern Union received and the actual value it conveyed (the right to pursue a tender offer). *See id.*

### ii. California Supreme Court cases

Nearly fifty years ago, the California Supreme Court rejected the theory of recovery of benefit-of-the bargain damages under Civil Code §§ 1709 and 3333. *Gagne v. Bertran*, 43 Cal.2d 481, 275 P.2d 15, 22 (1954). In *Gagne*, the plaintiffs purchased property in reliance on the defendant's misrepresentation. *Id.* The California Supreme Court held that the plaintiffs' damages should not be measured as though the defendant's misrepresentation had been true (i.e., benefit-of-the-bargain damages), but that "damages, whether for deceit or negligence, must be measured by the *actual losses suffered* because of the misrepresentation." *Gagne v. Bertran*, 43 Cal.2d 481, 275 P.2d 15, 22 (1954) (emphasis added); *see Gray v. Don Miller & Assocs.*, 35 Cal.3d 498, 198 Cal.Rptr. 551, 674 P.2d 253, 256 (1984) (quoting *Gagne* and holding that plaintiff "was entitled only to the 'actual losses suffered because of the misrepresentation' "). Applying this rule, the court found that if the property the plaintiffs had purchased was worth less than they paid for it, then the defendant was liable for the difference plus any proven consequential damages resulting from the purchase. If the property was worth what the plaintiffs had paid for it, however, the Court found that the "plaintiffs were not damaged ... for even though they would not have bought the [property] had they known the truth, they nevertheless received property as valuable as that with which they parted." *Gagne*, 275 P.2d at 22.

Five years after *Gagne*, the California Supreme Court seemed to recognize in

---

**21.** Believe it or not, before this case commenced.

**22.** Civil Code § 3343, discussed in some of the cases cited, provides that damages are limited to *actual damages suffered* in actions involving fraud by a vendor or vendee in a completed sale of property: "One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of

that which he received, together with any additional damage arising from the particular transaction[.]" Cal. Civ.Code § 3343 (enacted in 1935 and amended in 1971); *see Walsh v. Hooker & Fay*, 212 Cal.App.2d 450, 458, 28 Cal.Rptr. 16 (1963) (stating that "in the typical case involving a fraudulent vendor and a defrauded vendee, section 3343 provides the exclusive measure of damages"). Section 3343 is inapplicable in part because a merger was never consummated.

dictum a "fiduciary duty" exception to the "actual damages suffered" limitation for fraud: "In the *absence of a fiduciary relationship,* recovery in a tort action for fraud is limited to the actual damages suffered by the plaintiff." *Ward v. Taggart,* 51 Cal.2d 736, 336 P.2d 534, 537 (1959) (emphasis added).

### iii. First District Court of Appeal cases

After *Ward,* the First District Court of Appeal in California applied the "fiduciary duty" exception and stated that where the "defrauding party stands in a fiduciary relationship to the victim of fraud, the damages must be measured pursuant to *the broad provisions of sections 3333 and 1709* regulating compensation for torts in general." *Pepitone v. Russo,* 64 Cal. App.3d 685, 134 Cal.Rptr. 709, 711 (1976) (citations omitted) (emphasis added); *see Salahutdin v. Valley of Cal.,* 24 Cal. App.4th 555, 29 Cal.Rptr.2d 463, 469 (1994); *see also Walsh v. Hooker & Fay,* 212 Cal.App.2d 450, 459, 28 Cal.Rptr. 16 (1963). The First District stated that the measure of damages under the "broad provisions" of Civil Code §§ 3333 and 1709 "tends to give the injured party the benefit of his bargain and insofar as possible to place him in the same position he would have been had the promisor performed the contract." *Pepitone,* 134 Cal.Rptr. at 711; *see Salahutdin,* 29 Cal.Rptr.2d at 470.

### iv. Fifth and Fourth District Court of Appeal cases

In contrast to the First District Court of Appeal, the Fifth District held in *Overgaard v. Johnson,* 68 Cal.App.3d 821, 823–24, 137 Cal.Rptr. 412 (1977), that benefit-of-the-bargain damages are *not* available to tort plaintiffs under Civil Code § 3333:

> [S]ection 3333 does not set forth any benefit of the bargain rule. That section simply sets out the measure of damages long recognized in torts, namely, to compensate a plaintiff for a loss sustained rather than give him the benefit of any contract bargain (see Prosser, Law of Torts (4th ed.1971) § 110).
>
> . . . .
>
> The concept behind Civil Code section 3333 is to make the successful plaintiff whole.

After setting forth benefit-of-the-bargain damages available for breach of contract causes of action contained in Civil Code § 3300, the court stated: "[C]ontrary to a number of cases, . . . the measure of damages in Civil Code section 3333 and Civil Code section 3300 is not the same (although in a given factual situation the result may be the same)." *Overgaard,* 68 Cal.App.3d at 824, 137 Cal.Rptr. 412. The court also explained that the First District cases that have been interpreted to allow benefit-of-the-bargain damages under Civil Code § 3333 have been misinterpreted. *Id.* at 824–26, 137 Cal.Rptr. 412. Having distinguished the First District cases, the court reversed the trial court's benefit-of-the-bargain damages award. *Id.* at 828, 137 Cal.Rptr. 412.

More recently, the Fifth District, citing Civil Code § 3333 and relying on *Overgaard,* stated in *Christiansen v. Roddy,* 186 Cal.App.3d 780, 231 Cal.Rptr. 72, 78 (1986):

> The proper measure of tort damages is the "out-of-pocket" measure; successful tort plaintiffs are not entitled to have damages computed on a contract, or "benefit-of-the-bargain," theory.
>
> . . . .
>
> "A plaintiff in a tort action is not, in being awarded damages, to be placed in a better position than he would have been had the wrong not been done."

(Citations omitted). As recently as July 2001, the Fifth Circuit reversed a trial court for instructing the jury to determine benefit-of-the-bargain damages and held that, even in cases involving fiduciary

fraud, "the measure of damages ... is *out of pocket damages,* not the benefit of the bargain computation normally applicable to contract causes of action." *Hensley v. McSweeney,* 90 Cal.App.4th 1081, 109 Cal. Rptr.2d 489, 491–92 (2001) (relying on *Christiansen* and *Overgaard* ) (emphasis added). Consistent with the Fifth District Court of Appeal, the Fourth District has held that a defrauded party is "limited to recovering his 'out-of-pocket' loss, i.e., the difference between the value he parted with and the value he received." *Kenly v. Ukegawa,* 16 Cal.App.4th 49, 19 Cal. Rptr.2d 771, 773 (1993) (citing *Christiansen* ).[23]

### v. Southern Union is not entitled to benefit-of-the-bargain damages on the fraudulent inducement claim

■ Here, Southern Union does not contend that Southwest owed Southern Union a fiduciary duty, and Southern Union does not cite a single case in which benefit-of-the-bargain damages were recoverable for fraud absent a breach of fiduciary duties.[24] Thus, the Court finds

that "[Southern Union's] position is not supported by the main line of [California] case authority." *Eckert Cold Storage, Inc. v. Behl,* 943 F.Supp. 1230, 1234 (E.D.Cal. 1996). "Under this precedent, [Civil Code § ]3333 does not provide benefit of the bargain recovery[.]" *Id.* (citing *Alliance Mortgage,* 44 Cal.Rptr.2d at 367, 900 P.2d 601; *Gray,* 198 Cal.Rptr. 551, 674 P.2d at 255; *Kenly,* 19 Cal.Rptr.2d at 774; *Christiansen,* 231 Cal.Rptr. at 78).[25] "Rather, [Southern Union's] recovery [for fraudulent inducement] must be limited to the losses proximately caused by [Southwest's] alleged misrepresentations: the damages awarded should place [Southern Union] in the position [it] would have occupied had the misrepresentations not occurred." *Id.* (citing *Gray,* 198 Cal.Rptr. 551, 674 P.2d at 255; *Kenly,* 19 Cal.Rptr.2d at 774); see *Auble v. Pacific Gas & Elec. Co.,* 55 F.Supp.2d 1019, 1022–23 (N.D.Cal.1999) ("In California, in the absence of a fiduciary relationship, recovery for the tort of fraud is limited to the actual, out-of-pocket damages suffered by the plaintiff.") (citations omitted).[26]

**23.** The plaintiff in *Kenly,* like Southern Union, sought "lost profit" damages for property that he never acquired allegedly due to the defendant's fraud. Relying on the California Supreme Court's holding in *Gray,* the Fourth District held that the plaintiff was not entitled to lost profit damages because "[c]ases involving fraud where property was not acquired have limited damages to out-of-pocket losses." *Id.,* 19 Cal.Rptr.2d at 774.

**24.** Moreover, even in cases involving fiduciary fraud, the damages awarded have not been benefit-of-the-bargain damages, though there is reference to such damages in those cases. *See Overgaard,* 68 Cal.App.3d at 824–26, 137 Cal.Rptr. 412.

**25.** Southern Union relies on *Alliance Mortgage* for the proposition that, even without a breach of fiduciary duties, Civil Code §§ 3333 and 1709 provide a "broader" measure of fraud damages than Civil Code § 3343. (Reply at 4). Southern Union argues that, under these " 'broad' damages sections, 'benefit-of-

the-bargain' damages are recoverable." (*Id.* at 3). *Alliance Mortgage,* however, does not support such a proposition. The Court in *Alliance Mortgage* merely declined to address "whether benefit of the bargain damages were available in cases of *intentional* fiduciary fraud." *Eckert Cold Storage,* 943 F.Supp. at 1234 n. 6 (emphasis in original). Other California cases make clear, however, that benefit-of-the-bargain damages are not available to Southern Union on its fraudulent inducement claim. *See Overgaard,* 68 Cal. App.3d at 823–24, 137 Cal.Rptr. 412; *Christiansen,* 231 Cal.Rptr. at 78; *Kenly,* 19 Cal. Rptr.2d at 773.

**26.** Even if Southern Union *could* recover benefit-of-the-bargain damages on its fraudulent inducement claim, the bargain it struck was for a good faith evaluation of its merger proposal, not a consummated merger. The recovery of the benefit of its bargain—a good faith evaluation—is equivalent to its actual out-of-pocket reliance damages because

#### d. punitive damages

■ Cal. Civ.Code § 3294 provides that a party must prove fraud by clear and convincing evidence to obtain punitive damages: "In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant," Cal. Civ.Code § 3294(a). Southwest and Maffie assert that Southern Union cannot prove fraud by clear and convincing evidence and, thus, cannot obtain punitive damages. In its Response to Maffie's Motion for Summary Judgment, Southern Union asserts that the clear and convincing evidence standard has no place in the analysis of a summary judgment motion. Rather, the issue is whether there are sufficient facts for the *jury* to make a finding on punitive damages. *See, e.g., Nat'l Consumer Co-op., Bank v. Madden,* 737 F.Supp. 1108, 1115 (D.Haw.1990).

Although Southern Union is mistaken regarding the evidentiary standard on a motion for summary judgment, *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252–56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Court finds that because there are genuine issues of material fact regarding whether Southern Union was fraudulently induced to enter into the Standstill Agreement, there is a genuine issue of material fact on the issue of punitive dam-

ages. *See Nat'l Consumer Co-op,* 737 F.Supp. at 1115.

### III. SOUTHWEST'S MOTIONS FOR SUMMARY JUDGMENT ON SOUTHERN UNION'S BREACH OF CONTRACT AND BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING CLAIMS

In Count Four of Southern Union's Second Amended Complaint in the First Arizona Action, Southern Union alleges that Southwest breached the Standstill Agreement because it failed to evaluate Southern Union's merger offer in good faith.[27] In Count Five, Southern Union alleges that Southwest breached the covenant of good faith and fair dealing with respect to the Standstill Agreement.[28] Because Southern Union claims that Southwest breached the covenant of good faith and fair dealing in the same manner that it breached the Standstill Agreement, the analysis of these claims is identical. Pursuant to the Court's June 21, 2001 Order, California law governs both claims.

In its September 26, 2001 Order, the Court granted Southwest's Motion for Summary Judgment on Southern Union's Claims Based on the Alleged Duty to Evaluate and for Damages (Doc. # 1033) and its Motion for Summary Judgment Re: Southern Union's Contract Claims (Doc. # 1035) to the extent that Southern Union is seeking lost profit damages for the failed merger with Southwest, but denied the motions to the extent that Southern Union is seeking out-of-pocket damages on Counts Four and Five.[29]

---

Southern Union cannot establish lost profit damages for the failed merger with reasonable certainty as required under California law. *See, e.g., Christiansen,* 231 Cal.Rptr. at 78; *Eckert Cold Storage,* 943 F.Supp. at 1235.

**27.** Pursuant to the parties' stipulation, Count Four in the First Arizona Action shall constitute Southern Union's Counterclaim Four in the Nevada Action. (*See* 9/26/01 Order).

**28.** Pursuant to the parties' stipulation, Count Five in the First Arizona Action shall constitute Southern Union's Counterclaim Five in the Nevada Action. (*See* 9/26/01 Order).

**29.** These decisions are applicable to Rose, who joined both of Southwest's motions.

## A. Enforceability of Agreements to Evaluate/Negotiate in Good Faith

As an initial matter, Southwest points out that Southern Union's contract claims arise out of an alleged agreement between Southwest and Southern Union "to evaluate or negotiate" in good faith. (Mot. at 3). According to Southwest, *Vestar* establishes that "such agreements are not enforceable under California law." (*Id.*). Southern Union argues that such agreements *are* enforceable under California law and, in any case, Southwest's conduct with respect to the Standstill Agreement establishes that it is enforceable.

 Southwest's reliance on *Vestar* is unavailing. In *Vestar*, the Ninth Circuit noted that "agreements to negotiate *may* be unenforceable as a matter of law in California" as suggested by several California courts of appeal decisions "*when taken out of context.*" *Vestar*, 249 F.3d at 961 (emphasis added). The *Vestar* court also observed that "no California court has affirmatively held that agreements to negotiate *are* enforceable, even for reliance damages." *Id.* (emphasis in original). However, all of the cases cited in *Vestar* involved attempts to enforce the underlying substantive contract, not the agreement to negotiate. Moreover, in *Racine & Laramie, Ltd., Inc. v. California Department of Parks & Recreation*, 11 Cal. App.4th 1026, 14 Cal.Rptr.2d 335, 340–41 (1992), cited in *Vestar*, the California Court of Appeal found that while parties do not generally have a duty to negotiate and may break off negotiations for any reason, the parties can "by letter of intent or otherwise, agree that they will bargain in good faith for the purpose of reaching an agreement." *Id.* Thus, California law does recognize the enforceability of at least some agreements to negotiate.

 The Court has concluded that the Standstill Agreement, together with Maffie's alleged statement, required Southwest to evaluate Southern Union's merger offer in good faith. (6/21/01 Order at 27–28). California law allows for the enforcement of such agreements, especially where, as here, a party alleges that it relied on the agreement to its detriment. Accordingly, Southern Union can seek damages for the alleged breach of the Standstill Agreement, including the breach of the covenant of good faith and fair dealing.

As part of its damages for Southwest's alleged breach of contract, Southern Union seeks lost profits for the failed merger. According to Southern Union, it was "reasonably certain" to merge with Southwest if it had received a good faith evaluation of its merger offer. Southwest argues that Southern Union's proposal did receive a good faith evaluation and was rejected for valid business reasons, and that the Standstill Agreement itself precludes Southern Union from recovering any damages for failure to merge.

## B. Good Faith Evaluation

Whether Southern Union's merger offer received a good faith evaluation from Southwest is a question of fact. Southwest argues that its Board's February 21, 1999 determination that Southern Union's offer was a "Superior Proposal" within the meaning of the Southwest–ONEOK Merger Agreement establishes that the Board fairly evaluated Southern Union's offer. Southwest also contends that Southern Union's subsequent offer similarly received thorough consideration over a three-month period, as reflected in Board meetings and ongoing negotiations with Southern Union.

 Southern Union argues that Southwest's bad faith is evidenced by Southwest management's placement of false and misleading information about Southern Union before the Southwest Board during its merger deliberations. Southern Union also notes that the February 21, 1999 "Superior Proposal" determi-

nation predates the Standstill Agreement, so the good faith evaluation of *that* proposal has no bearing on the subsequent treatment of Southwest's later merger offer. In light of these conflicting factual accounts, the Court finds a genuine issue of material fact regarding whether Southern Union received a good faith evaluation of its merger offer.

## C. Damages for Breach of Contract

Southwest argues that Southern Union cannot recover damages for the alleged breach of the Standstill Agreement because it expressly disclaims any obligation to merge, as well as any liability for the failure to merge. In particular, paragraph 10 of the Standstill Agreement provides:

> Each party hereto agrees that unless and until a definitive agreement with respect to the Proposal referred to in the first paragraph of the Agreement has been executed and delivered, *neither it nor the other party hereto will be under any legal obligation of any kind whatsoever with respect to such a transaction* by virtue of the Agreement or any written or oral expression with respect to such a transaction by any of its Representatives or by any Representatives thereof except, in the case of the Agreement, for the matters specifically agreed to herein.

(Standstill Agreement ¶ 10) (emphasis added). Southern Union argues that despite the Standstill Agreement's disclaimer regarding the failure to merge, it does *not* preclude damages for Southwest's failure to evaluate in good faith. Southern Union contends that as a consequence of Southwest's breach of its duty to evaluate Southern Union's offer in good faith, Southern Union lost profits it otherwise would have realized from a successful merger with Southwest. Southern Union's right to seek damages for Southwest's alleged breach of its duty to evaluate Southern Union's merger offer depends on the interpretation of paragraph 10 of the Standstill Agreement.

In California, "[t]he fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." *Foster–Gardner, Inc. v. National Union Fire Ins. Co.*, 18 Cal.4th 857, 77 Cal.Rptr.2d 107, 114, 959 P.2d 265 (1998) (citation and quotations omitted); *AIU Ins. Co. v. Superior Ct.*, 51 Cal.3d 807, 274 Cal.Rptr. 820, 831, 799 P.2d 1253 (1990); *Yount v. Acuff Rose–Opryland*, 103 F.3d 830, 835–36 (9th Cir.1996) (citing Cal. Civ. Code § 1636). The intent of the parties "is to be inferred, if possible, solely from the written provisions of the contract." *Foster–Gardner, Inc.*, 77 Cal.Rptr.2d at 114, 959 P.2d 265 (citation and quotations omitted); *AIU Ins. Co.*, 274 Cal.Rptr. at 831, 799 P.2d 1253. Clear and explicit language in a contract shall govern, and the provisions are to be interpreted in an "ordinary and popular sense." *Foster–Gardner, Inc.*, 77 Cal.Rptr.2d at 114, 959 P.2d 265; *AIU Ins. Co.*, 274 Cal.Rptr. at 831, 799 P.2d 1253. "A court will look beyond the terms of the writing where it appears that the parties intended to ascribe a 'technical' or 'special' meaning to the terms used." *Yount*, 103 F.3d at 836. If the language in a contract is clear, construction of the contract "becomes a matter of law determinable in a summary judgment proceeding." *Los Angeles Equestrian Ctr., Inc. v. City of L.A.*, 17 Cal.App.4th 432, 21 Cal.Rptr.2d 313, 322 (1993); *Centigram Argentina, S.A. v. Centigram Inc.*, 60 F.Supp.2d 1003, 1007 (N.D.Cal.1999) (unambiguous contract may be interpreted as a matter of law). Finally, "[a] contract must receive such an interpretation as will make it ... reasonable ... if it can be done without violating the intention of the parties." *Binder v. Aetna Life Ins. Co.*, 75 Cal.App.4th 832, 851–55, 89 Cal.Rptr.2d 540 (1999) (quoting Cal. Civ.Code § 1643 and citing Restatement (Second) of Contracts § 203).

Under the terms of the Standstill Agreement, the parties were not obligated to merge and were not liable for failure to merge. *See Crane Co. v. Coltec Indus., Inc.,* 171 F.3d 733, 736 (2d Cir.1999) (holding that similar contract language did not give rise to a duty to merge). Indeed, the disclaimer of liability in paragraph 10 expressly limits damages for "matters specifically agreed to" in the Standstill Agreement, including the duty to evaluate in good faith. To allow Southern Union to recover for damages resulting from the parties' failure to merge, which the disclaimer explicitly denies, would render paragraph 10 of the Standstill Agreement a nullity. The Court will not adopt an interpretation that has this unreasonable result. *See Binder,* 75 Cal.App.4th at 852, 89 Cal.Rptr.2d 540.

■ Southern Union is entitled to seek damages for Southwest's alleged breach of its duty to evaluate Southern Union's merger offer in good faith, but is limited to recovering its actual out-of-pocket reliance damages for the expenses it incurred in rendering performance under the Standstill Agreement. Even if Southern Union were not limited to its out-of-pocket damages by the terms of Standstill Agreement, it would not be able to recover lost profits for the failed merger. As discussed above, under California law, lost profit damages may be recovered for breach of contract only where the lost profits can be shown with reasonable certainty. *See Vestar Dev. II, LLC v. General Dynamics Corp.,* 249 F.3d 958 (9th Cir.2001), and as discussed more fully below in the context of

Southern Union's tortious interference claims, Southern Union cannot establish with reasonable certainty the amount, if any, of its lost profit damages from the failed merger with Southwest.

## IV. MOTIONS FOR SUMMARY JUDGMENT ON SOUTHERN UNION'S TORTIOUS INTERFERENCE CLAIMS

Southern Union has asserted two tortious interference claims. Count Seven of Southern Union's Second Amended Complaint in the First Arizona Action alleges tortious interference with a business relationship against Irvin, Rose, ONEOK, Eugene Dubay,[30] and John Gaberino.[31] Count Eight alleges tortious interference with a contractual relationship against Irvin, Rose, Dubay, and Gaberino.[32]

The basis for Southern Union's tortious interference claims is that Irvin, Rose, ONEOK, Dubay, and Gaberino allegedly conspired to disrupt a prospective merger between Southern Union and Southwest (Count Seven) and to interfere with the Standstill Agreement between Southern Union and Southwest (Count Eight). According to Southern Union, "Rose, Irvin and ONEOK conspired to place before the Southwest Board false and misleading information that would sway the Board into ... voting for the less attractive ONEOK offer." (Southern Union Co.'s Mem. of Law in Opp'n to Def. Rose's Mot. Summ. J. at 8). Specifically, Southern Union alleges that Irvin, Rose, ONEOK, Dubay, and Gaberino together drafted, revised, and circulated the Irvin Letter, which was instrumental in the Southwest Board's de-

**30.** Dubay was President of Kansas Gas Service, a division of ONEOK.

**31.** Gaberino is the Senior Vice President and General Counsel for ONEOK.

**32.** With respect to ONEOK, Count Seven is construed as a Counterclaim in the First

Oklahoma Action, but as to Irvin, Rose, Dubay, and Gaberino, both Counts Seven and Eight are construed as direct claims in the First Arizona Action. The Court has determined that Arizona law applies to Southern Union's tortious interference claims. (*See* 6/21/01 Order).

cision to reject Southern Union's merger offer in favor of ONEOK's. Additionally, Southern Union alleges that Rose and Irvin, with ONEOK's acquiescence, improperly solicited support for the ONEOK merger from various public utility commissions while disparaging Southern Union as an unsuitable merger partner. Southern Union further alleges that Rose, Irvin, and ONEOK (including Dubay and Gaberino) participated in activities designed to undermine Southern Union's financially superior merger offer by falsely casting doubt on Southern Union's ability to obtain financial and regulatory approval for the proposed merger with Southwest. In the course of these activities, Irvin and Rose allegedly persuaded Nevada Governor Kenny Guinn to contact Southwest to express his disapproval of a merger with Southern Union. Southern Union contends that these activities prevented Southwest from evaluating Southern Union's merger offer in good faith as required by the Standstill Agreement.

In its September 26, 2001 Order, the Court: (1) denied Rose's Motion for Summary Judgment on Counts Seven and Eight Alleging Tortious Interference (Doc. # 1031);[33] (2) granted ONEOK, Inc.'s Motion for Summary Judgment on Count Seven of Southern Union Company's Second Amended Complaint (Doc. # 1048) to the extent that Southern Union is seeking lost profit damages on Count Seven for the failed merger with Southwest, but denied it to the extent that Southern Union is seeking out-of-pocket and punitive damages on Count Seven;[34] (3) granted Gaberino's Motion for Summary Judgment (Doc. # 1026) and Dubay's Motion for Summary Judgment on Counts Seven and Eight of Southern Union's Second Amended Complaint (Doc. # 1028) completely with respect to Count Eight, but granted the motions with respect to Count Seven only to the extent that Southern Union is seeking lost profit damages on Count Seven;[35] and (4) denied as moot Gaberino's Motion for Court to Apply June 21, 2001 Rulings to Him (Doc. # 1016).[36]

## A. Tortious Interference

ACC Commissioner Irvin wrote a letter to Maffie and Hartley of Southwest on April 5, 1999 ("Irvin Letter"). As discussed above, the Irvin Letter generally advised Maffie and Hartley about the factors the ACC would consider in evaluating applications for regulatory approval, stating: "I also have spent a considerable amount of time discussing these factors with my colleagues at the Nevada and California utility commissions, and advise you that they share my concerns." Although the letter does not explicitly favor ONEOK over Southern Union, Judy Sheldrew, Chairperson of the PUCN, has testified that "Mr. Irvin said that the way the letter was written, it was designed ... to point to ONEOK but that we couldn't say that in so many words because that would be improper." (10/5/99 Sheldrew Depo. at 52).[37]

---

33. This decision is applicable to Gaberino, who joined Rose's motion.

34. This decision is applicable to Rose, Gaberino, and Dubay, who joined ONEOK's motion.

35. This decision is applicable to Gaberino, who joined Dubay's motion.

36. Gaberino made the same arguments in both his Motion for Summary Judgment and his Motion for Court to Apply June 21, 2001

Rulings to Him. Thus, once the Court ruled on his Motion for Summary Judgment, it denied his other motion as moot. (*See* 9/26/01 Order).

37. Irvin and Rose allegedly met with Sheldrew on March 24, 1999 and provided her with an early draft of the Irvin Letter. According to Sheldrew, Irvin and Rose tried to persuade her to sign a similar version of the letter along with the Commissioners of the

In addition to the Irvin Letter, a recorded telephone call from Irvin to Maffie ("Irvin Phone Call") was played to the Southwest Board on April 5, 1999.[38] The tape recording was subsequently erased, but Maffie's notes of the conversation indicate that Irvin told Maffie, among other things, that "Southern Union probably won't pass regulatory approval." (5/15/00 Maffie Depo. at 202). Maffie testified that "it was clear by [Irvin's] comments that ... he favored the ONEOK transaction." (*Id.* at 130). In addition, Nevada Governor Guinn telephoned Maffie the week before the April 5, 1999 Southwest Board meeting and admonished Maffie that the Board should "read between the lines" of the Irvin Letter.[39] Governor Guinn also expressed doubt that Southern Union was fit to do business in Nevada. (4/21/99 Maffie Depo. at 93).[40]

## B. Tortious Interference under Arizona Law

■■■ Under Arizona law, the elements of a claim of tortious interference with a business relationship are: (1) the existence of a valid contractual relationship or business expectancy;[41] (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

■■■ *Antwerp Diamond Exchange of Am., Inc. v. Better Bus. Bur. of Maricopa County, Inc.*, 130 Ariz. 523, 637 P.2d 733, 740 (1981) (internal quotations and citations omitted). "In addition to proving the four elements stated in *Antwerp Diamond Exchange*, the plaintiff bringing a tortious interference action must show that

CPUC and ACC. (10/5/99 Sheldrew Depo. at 51–53, 55–56).

**38.** Irvin testified that the telephone call was placed from Rose's home/office. (*See* 3/22/00 Irvin Depo. at 197–200).

**39.** Southern Union alleges that Governor Guinn's telephone call, in which he endorsed the Irvin Letter, was also orchestrated by Irvin and Rose. (*See* Southern Union's Resp. to Rose's SOF at 10–11).

**40.** In its June 21, 2001 Order, the Court dismissed Count Eight (tortious interference with contractual relations) with respect to ONEOK, finding that because ONEOK was not a stranger to the Standstill Agreement, it could not, as a matter of law, interfere with the Standstill Agreement. *See Atlanta Mkt. Ctr. Mgmt. Co. v. McLane*, 269 Ga. 604, 503 S.E.2d 278, 283 (1998); *Payne v. Pennzoil Corp.*, 138 Ariz. 52, 672 P.2d 1322, 1327 (App. 1983). At the August 24, 2001 hearing on the present motions, Southern Union conceded that, in light of the Court's ruling, Southern Union could not sustain its claims under Count Eight with respect to Dubay and Gaberino of ONEOK because it could not offer evidence to establish that Dubay and Gaberi-

no were strangers to the Standstill Agreement. (8/24/01 Hr'g Tr. at 109). Accordingly, the Court granted Dubay's and Gaberino's motions for summary judgment on Count Eight. Thus, Count Eight alleges a cause of action against only Irvin and Rose.

**41.** Although a claim of tortious interference with *contract* is distinct from a claim of tortious interference with a *business relationship,* the elements are virtually identical. As set forth in Restatement (Second) of Contracts § 766 cmt. c:

The liability for inducing breach of contract is now regarded as but one instance ... of protection; but some protection is appropriate against improper interference with reasonable expectancies of commercial relations even when an existing contract is lacking.... The differentiation between them relates primarily to the scope of the justification or the kind and amount of interference that is not improper in view of the differences in the facts.

*See Antwerp Diamond Exchange*, 637 P.2d at 740 (identifying elements of interference tort as common to both a "contractual relationship" and "business expectancy").

the defendant acted improperly." *Wagenseller v. Scottsdale Mem'l Hosp.*, 147 Ariz. 370, 710 P.2d 1025, 1043 (1985). In addition, to prevail on a claim of tortious interference with a business relationship, "when the relationship is prospective, there must be a reasonable assurance that the contract or relationship would have been entered into" but for the interference. *Megawatt Corp. v. Tucson Elec. Power Co.*, CIV No. 86–173–PGR–TUC, 1989 WL 95602, at *8 (D.Ariz. May 26, 1989). Finally, to recover lost profits for the failed merger, a plaintiff must provide evidence "to furnish a reasonably certain factual basis for computation of probable losses." *Rancho Pescado, Inc. v. Northwestern Mut. Life Ins. Co.*, 140 Ariz. 174, 680 P.2d 1235, 1245 (App.1984); *see Vestar Dev. II, LLC v. General Dynamics Corp.*, 249 F.3d 958, 961 (9th Cir.2001) ("It has long been settled in California that the proof must establish with reasonable certainty and probability that damages will result in the future to the person wronged.") (internal quotations omitted).

### 1. ONEOK

ONEOK argues that Southern Union's tortious interference claim fails because Southern Union cannot show that it was "reasonably assured" of consummating a merger with Southwest "but for" ONEOK's alleged interference. ONEOK further argues that because Southern Union cannot establish even the *existence* of damages, it cannot, as a matter of law, establish the *amount* of its alleged damages with "reasonable certainty."

#### a. reasonable assurance of a merger

ONEOK argues that Southern Union cannot show that it was reasonably assured of merging with Southwest because the parties were not close to reaching a definitive merger agreement. According to ONEOK, at least six "significant" terms remained in dispute, "including South-west's request for a $200 million liquidated damages provision and Southern Union's refusal to pay the $30 million termination fee due to ONEOK upon termination of the Merger Agreement." (ONEOK's Mot. Summ. J. at 7–8). ONEOK also contends that "only one of the six principal areas of contention ... was even *remotely* related to the issues purportedly raised" by ONEOK's alleged interference. (*Id.* at 8).

Both ONEOK and Southern Union cite *Megawatt Corp. v. Tucson Elec. Power Co.*, No. CIV 86–173–PGR–TUC, 1989 WL 95602 (D.Ariz. May 26, 1989), in support of their positions. In *Megawatt*, which also involved a failed utilities merger, the court denied summary judgment because there was sufficient evidence from which a jury could conclude that the defendant's alleged interference deprived the plaintiff of an opportunity to outbid its competitor. ONEOK argues that the present case is distinguishable because the Southwest Board, unlike the target company in *Megawatt*, was not exclusively concerned with selling to the highest bidder. ONEOK maintains that the higher per-share price of Southern Union's offer does not establish that it was reasonably assured of acceptance because the Southwest Board was focusing on "other factors" of "equal importance," including the acquiring party's "ability to obtain regulatory approval" and to finance the transaction. (*Id.* at 9).

Southern Union, however, has presented evidence from which a jury could reasonably infer that it was close to reaching a deal with Southwest, and that the remaining points of contention resulted at least in part from ONEOK's alleged interference. For example, Southwest sought to impose a more restrictive "regulatory out" provision on Southern Union than that included in the ONEOK Merger Agreement. (*See* 10/31/00 Cavalier Depo. at 403–04). Southwest also sought to extract an unprecedented liquidated damage provision.

(*Id.* at 405). According to Southern Union, "Southwest's stated reason for demanding the handful of onerous terms was 'regulatory concerns.'" (Opp'n at 28).

 With respect to Southwest's stated concerns about Southern Union's ability to finance the merger, Southwest's own financial advisers testified that they believed Southern Union could have obtained financing for the merger at the time the offer was being considered by the Southwest Board. (*See* 3/16/01 Rifkin Depo. at 81–82). In addition, Leonard Judd, a Southwest Board member, testified that in evaluating competing merger offers, "[a]ll things being equal, [he would] take the higher offer." (1/5/00 Judd Depo. at 37). Similarly, the Sitrick Memo notes that "[n]o matter how you spin it, $32 is more than $30, and a lot more than $28.50." (Sitrick Memo at 5). Indeed, Southwest's own press releases, proxy statements and statements to regulatory officials cited regulatory concerns—not financial considerations—as the reason that Southwest rejected Southern Union's higher offer. In light of this conflicting evidence, the Court finds genuine issues of material fact whether Southern Union was reasonably assured of consummating the merger with Southern Union.

### b. "but for" causation

As already noted, Southern Union must establish that it was reasonably assured of a merger with Southwest but for ONEOK's alleged interference. *See Megawatt*, 1989 WL 95602, at *8. Although ONEOK's primary argument is that Southern Union was not reasonably assured of merging with Southwest, ONEOK also argues that ONEOK's alleged interference did not *cause* the merger to fail. According to ONEOK, "Southern Union must prove that ONEOK provided information to the Southwest Board that was material to the Board's decision to reject the Southern Union proposal. Unfortunately for Southern Union, the uncontroverted evidence is to the contrary." (ONEOK's Mot. Summ. J. at 11).

ONEOK's characterization of the evidentiary record is demonstrably false. ONEOK dismisses the possible significance to a jury of the Irvin Letter and Irvin Phone Call, pointing out that "each member of the Southwest Board who has been deposed in this case has testified that neither the Irvin letter nor the Irvin phone call impacted his or her decision to approve the ONEOK merger or to recommend the merger to the shareholders." [42] (*Id.*). However, Southern Union has offered evidence that may cast doubt on the testimony of Southwest Board members concerning the effect, if any, of the Irvin Letter and Irvin Phone Call. For example, while Maffie testified that the Irvin Letter and Irvin Phone Call were not material to

---

**42.** ONEOK also points out that Southwest's Proxy Statement seeking approval of the ONEOK merger offer purports to list "all of the material factors considered by the Board" in deciding to reject Southern Union's merger offer. ONEOK reasons that because Southwest was bound by securities regulations to disclose the information relevant to its decision, the fact that the Proxy Statement omits mention of the Irvin Letter and Irvin Phone Call "establishes [as a matter of law] that the Board did not deem either to be material." (ONEOK's Mot. Summ. J. at 12). While the omission may provide evidentiary support for the conclusion that the Board did not rely on the Irvin information, it does not *establish* as a matter of law what the Board actually relied on. Indeed, the Southwest Board not only discussed the Irvin Letter and Irvin Phone Call, it is undisputed that the Board heard a taped recording of the call but omitted this fact from its Board Minutes. (*See* 5/16/00 Maffie Depo. at 421, 424–25). Under these circumstances, notwithstanding the Proxy Statement, it is far from "established" what the Board did, or did not, rely on in reaching its decision.

his and the Southwest Board's rejection of Southern Union's merger offer, (*see* 5/25/01 Maffie Depo. at 538–39), Jim Fisher[43] testified that Maffie said that the Irvin Letter "was very important, influential and quite helpful in guiding the Board to choose ONEOK over the Southern Union offer." (7/4/99 Fisher Aff. ¶ 30). Additionally, Maffie has testified that among the "incidents" that contributed to Southwest's concern about Southern Union's ability to win regulatory approval were the Irvin Letter and Irvin Phone Call and the telephone call to Maffie from Governor Guinn. (4/21/99 Maffie Depo. at 93).

 The testimony of other participants at the April 5, 1999 Southwest Board meeting also suggests that Board members may have been influenced by the Irvin Letter. For example, Thomas Gerlacher,[44] who was present at the Southwest Board meeting, testified that the Southwest Board discussed in connection with the Irvin Letter the "big problem" that at least one member of the ACC had "grave concerns" about Southern Union. (6/7/01 Gerlacher Depo. at 111). Gerlacher also testified that the Southwest Board was troubled by Irvin's concerns. (*Id.* at 111–12). In light of this conflicting evidence, the Court finds that there are genuine issues of material fact regarding whether the Irvin Letter, the Irvin Phone Call, and/or Governor Guinn's telephone call affected the Southwest Board's decision to reject Southern Union's merger offer.

### c. the "reasonable certainty" requirement for Southern Union's lost profit damages from the failed merger with Southwest

 In order to recover lost profits for the failed merger, Southern Union must establish the amount of its damages with reasonable certainty. *See Rancho Pescado,* 680 P.2d at 1244–47; *Vestar,* 249 F.3d at 962. Although "the amount of damages may be established with proof of a lesser degree of certainty than required to establish the fact of damages, ... there still must be a reasonable basis in the evidence for the trier of fact to fix computation when a dollar loss is claimed." *Rancho Pescado,* 680 P.2d at 1245.

Southern Union invokes various Restatement provisions to argue that: (1) because Southwest is a well-established business, its past performance provides a reasonable basis for the calculation of future profits, *see* Restatement (Second) of Contracts § 352 cmt. b; (2) a court "may, in determining whether the proof meets the requirement of reasonable certainty, give due weight to the fact that the question was made hypothetical by the very wrong of the defendant," *Id.* at § 774A cmt. c; and (3) "it is not fatal to the recovery of substantial damages that [the plaintiff] is unable to prove with definiteness the amount of the profits he would have made or the amount of the harm that the defendant has caused," Restatement (Second) of Torts § 912 cmt. d.

 Although Southern Union offers a dense three-volume expert report (subject to a *Daubert* challenge) purporting to calculate the "synergistic" effects of a Southern Union–Southwest merger and the resulting profits, Southern Union offers insufficient evidence to establish the terms of a consummated merger with Southwest. Such a showing is an essential starting point to any reasonable computation of alleged lost profits. *See, e.g., Computer Sciences Corp. v. Computer As-*

---

**43.** Jim Fisher worked for ACC Commissioner Tony West.

**44.** Thomas Gerlacher was the Vice President of Mergers and Acquisitions at Merrill Lynch and at that time advised the Southwest Board on the mergers and acquisitions environment.

*socs. Int'l,* Nos. CV 98–1374–WMB SHX, CV 98–1440–WMB SHX, 1999 WL 675446, at *25 (C.D.Cal. Aug.12, 1999). Indeed, though Southern Union's highest offer was $33.50 per share, there is evidence to suggest that Southern Union would have been willing to pay as much as $36 per share, (*see* 11/6/00 Kelley 30(b)(6) Depo. at 30), and that Southwest would not have accepted less than $40 per share from Southern Union, (*see* 5/16/00 Maffie Depo. at 304). The indeterminacy concerning this basic merger term illustrates that Southern Union's claim for lost profit damages is too speculative to support recovery.

▋ Despite the ruling regarding Southern Union's alleged lost profit damages, because the Court finds a genuine issue of material fact regarding whether Southern Union was reasonably assured of merging with Southwest, Southern Union will be permitted to seek its actual out-of-pocket reliance damages, if any, caused by ONEOK's alleged interference with Southern Union's business relationship.

### 2. Rose

Southern Union contends that Rose, together with Irvin and ONEOK, worked in concert to cause a breach of the Standstill Agreement (Count Eight) and termination of the business relationship between Southern Union and Southwest (Count Seven). Specifically, Southern Union alleges that Irvin, Rose, and ONEOK undertook to sabotage a possible Southern Union–Southwest merger by manufacturing and disseminating false information about Southern Union that resulted in the Southwest Board's rejection of Southern Union's financially superior merger offer. Southern Union argues that, but for the actions of these Defendants, Southern Union was reasonably assured of consummating a merger with Southwest and realizing substantial profits.

#### a. "conspiracy"

As an initial matter, Rose argues that because the Court dismissed Southern Union's tortious interference claims with respect to Maffie (Counts Seven and Eight) and ONEOK (Count Eight) on the grounds that they were not strangers to the Standstill Agreement and thus could not, as a matter of law, interfere with the Standstill Agreement, the Court should also dismiss Southern Union's tortious interference claims against him. Rose contends that the viability of Southern Union's tortious interference claims depends upon the existence of a conspiracy among Rose, Maffie, ONEOK, and others: "When the independent actions of [the other defendants] are disregarded, the evidence does not show any act by Rose, or any act attributable to Rose as a co-conspirator, that could have influenced the Southwest Gas Board of Director's decision" to reject the Southern Union merger offer. (Def. Rose's Mot. Summ. J. on Counts 7 & 8 Alleging Tortious Interference at 2–3).

Rose principally relies on *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.,* 7 Cal.4th 503, 28 Cal.Rptr.2d 475, 869 P.2d 454 (1994) and *Kasparian v. County of Los Angeles,* 38 Cal.App.4th 242, 45 Cal.Rptr.2d 90 (1995). In *Applied Equipment,* the Supreme Court of California noted that "[c]onspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." 7 Cal.4th at 510–11, 28 Cal.Rptr.2d 475, 869 P.2d 454. "The tort cause of action for interference with a contract does not lie against a party to the contract." *Id.* at 514, 28 Cal.Rptr.2d 475, 869 P.2d 454. Moreover, "tort liability arising from conspiracy presupposes that the coconspirator is legally capable of committing the tort,

i.e., that he or she owes a duty to plaintiff recognized by law and is potentially subject to liability for breach of that duty." *Id.* at 511, 28 Cal.Rptr.2d 475, 869 P.2d 454. Thus "[b]ecause a party to a contract owes no tort duty to refrain from interference with its performance, he or she cannot be bootstrapped into tort liability by the pejorative plea of conspiracy." *Id.*

In *Kasparian,* the court extended the principle set forth in *Applied Equipment* to prospective economic relations: "[T]he same rationale should also bar prosecution of the tort of interference with prospective economic advantage against a party to the relationship from which the plaintiff's anticipated economic advantage would arise." *Kasparian,* 38 Cal.App.4th at 262, 45 Cal. Rptr.2d 90. The *Kasparian* court thus rejected interference liability for the defendant, though he was a stranger to the business relationship, because the plaintiff could not establish the elements of the tort of interference without imputing to the defendant the knowledge of his co-defendants, who, as parties to the business relationship, could not be liable for interference. *Id.* at 268, 45 Cal.Rptr.2d 90.

Rose's reliance on *Applied Equipment* and *Kasparian* is misplaced. Southern Union's tortious interference claims against Rose are not predicated on a conspiracy theory by which the knowledge and conduct of each conspirator is to be imputed to all of the others.[45] Rather, Southern Union contends that Rose's and Irvin's independent conduct satisfies each of the elements for tortious interference and their conduct is not dependent on the acts of co-defendants Maffie and ONEOK.

Southern Union alleges that Rose possessed knowledge of the Standstill Agreement and business relationship between Southern Union and Southwest and intentionally caused their termination, resulting in damage to Southern Union. Neither *Applied Equipment* nor *Kasparian* precludes liability for tortious interference where a stranger to the contract or business relationship is independently a tortfeasor, satisfying each of the elements of the tort. *See Kasparian,* 38 Cal.App.4th at 272, 45 Cal.Rptr.2d 90 ("The County defendants … are strangers to the economic relationship between plaintiff and the WJM defendants and *could be liable for an interference tort,* but the evidence is simply not sufficient to demonstrate two of the essential elements of the tort on which plaintiff relies.") (emphasis added). As discussed below, Southern Union has presented evidence sufficient to create genuine issues of material fact regarding the essential elements of Southern Union's tortious interference claims against Rose.

### b. knowledge

In order to prevail on its tortious interference claims against Rose, Southern Union must prove that Rose possessed knowledge of the Standstill Agreement and business relationship between Southern Union and Southwest. *See Antwerp,* 637 P.2d at 740. Rose denies that he was aware of the *provisions* of the Standstill Agreement, but has not addressed whether he had knowledge of the business relationship—the prospective merger—between Southern Union and Southwest.

---

**45.** Southern Union's persistent characterization of the Defendants' conduct as "conspiratorial" throughout this litigation has contributed to the confusion. (*See, e.g.,* Southern Union's Mem. Law in Opp'n to Def. Rose's Mot. Summ. J. at 29). The Court understands Southern Union's Second Amended Complaint to allege that each of the alleged tort-feasors *worked in concert* to perpetrate the alleged interference, not that Southern Union has alleged a separate claim of "civil conspiracy." *See Pankratz v. Willis,* 155 Ariz. 8, 744 P.2d 1182, 1186 (App.1987) ("A civil conspiracy is not actionable in Arizona.... Once a contemplated tort is committed the actors are simply joint tort-feasors.").

Southern Union has offered evidence to establish a basis for a reasonable inference that Rose was aware of both the Standstill Agreement and of Southern Union's prospective business relationship with Southwest. Specifically, Southern Union presents evidence of numerous and ongoing communications throughout the course of the merger negotiations between Rose and Irvin and various members of Southwest and ONEOK management, including Maffie, Zub, Dubay, and Gaberino. (*See, e.g.,* 2/17/00 Dubay Depo. at 389–93, 440; 2/22/00 Dubay Depo. at 596–98, 602; 2/15/00 Dioguardi[46] Depo. at 309–11; 5/10/00 Gaberino Depo. at 273–74, 316–17). Southern Union has also offered evidence of Rose's extensive contacts with the various state regulatory agencies, including the ACC, CPUC, and PUCN, discussing the relative merits of Southern Union's and ONEOK's merger offers to Southwest. (*See* 3/21/00 Irvin Depo. at 114–15; 10/05/00 Sheldrew Depo. at 51–54; 3/22/00 Irvin Depo. at 155–57). This evidence provides adequate grounds for a jury to reasonably conclude that Rose was aware of the Standstill Agreement and, more generally, the prospective business relationship between Southern Union and Southwest.

 Apart from this affirmative evidence, Rose has invoked his Fifth Amendment right not to incriminate himself, declining to testify about his knowledge and intent with respect to his involvement in matters pertaining to this litigation. "Parties are free to invoke the Fifth Amendment in civil cases, but the [C]ourt is equally free to draw adverse inferences from their failure of proof." *S.E.C. v. Colello,* 139 F.3d 674, 676 (9th Cir.1998); *see, e.g., Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them[.]"); *United States v. Solano–Godines,* 120 F.3d 957, 962 (9th Cir. 1997) ("In civil proceedings ... the Fifth Amendment does not forbid fact finders from drawing adverse inferences against a party who refuses to testify."). A jury may draw adverse inferences from Rose's failure to testify create genuine issues of material fact regarding Rose's knowledge of and involvement in the allegedly tortious conduct.

### c. causation

Rose argues that his alleged involvement with Irvin, Dubay, and Gaberino cannot support Southern Union's tortious interference claims because the Irvin Letter and Irvin Phone Call did not have an impact on the Southwest Board's decision to reject Southern Union's merger offer, noting that Southwest Board members unanimously testified that their votes were not influenced by the Irvin Letter or Irvin Phone Call. (Rose's Mot. Summ. J. at 11). In any event, Rose contends that "[a]ny influence that the Irvin Letter or the phone call conceivably could have had was the result of Maffie's decision to forward the information to the Board." (*Id.* at 10). Rose argues that "there is no evidence that the letter or the phone call misled Maffie or any other Southwest Gas official." (*Id.*).

Rose contends that to establish liability, Southern Union must show that Rose "alone" caused the termination of the Standstill Agreement and Southern Union's prospective business relationship with Southwest. (*Id.* at 9). Rose also argues that he cannot be liable for tortious interference because his conduct "did not affect" Southwest's decision to reject the

---

46. Mark Dioguardi is an attorney at Tiffany & Bosco, LLP, who served as ONEOK's counsel and who has been dismissed from the case. (*See* 6/21/01 Order).

Southern Union merger offer. (*Id.* at 10). Therefore, he did not "induce" Southwest's breach of the Standstill Agreement or the termination of Southern Union's business relationship with Southwest. (*Id.* at 5).

To support his argument, Rose relies primarily on *Middleton v. Wallichs Music & Entertainment Co.*, 24 Ariz.App. 180, 536 P.2d 1072 (1975) and comment h of § 766 of the Restatement (Second) of Torts ("Restatement"). Rose notes that in *Middleton*, the court denied liability where "affirmative and active predisposition and action on the lessor's part ... negate[d] any basis for a finding that [defendant] tortiously induced lessor to breach his contract with the tenant." *Middleton*, 536 P.2d at 1075. Comment h of § 766 indicates that "[t]he word 'inducing' [in § 766] refers to the situation in which A causes B to choose one course of conduct over another." Rose contends that because there is evidence to suggest that Southwest *never* intended to merge with Southern Union, he could not have "induced" the breach of the Standstill Agreement or the termination of the business relationship because he did not initiate or physically force Southwest to breach the Standstill Agreement or terminate its business relationship with Southern Union.

Rose's argument is flawed. As discussed in the context of ONEOK's motion for summary judgment, the Court finds genuine issues of material fact concerning the effect, if any, that the Irvin Letter and Irvin Phone Call had on the Southwest Board. Although many of the Southwest Board members have testified that they were not influenced by the Irvin Letter and Irvin Phone Call, Southern Union has offered admissible evidence to create credibility issues regarding this testimony. Additionally, Maffie has testified that among the "incidents" that contributed to Southwest's concern about Southern Union's ability to win regulatory approval were the Irvin Letter and Irvin Phone Call, as well as the telephone call to Maffie from Governor Guinn. (4/21/99 Maffie Depo. at 93).

Rose's interpretation of the applicable legal standard fares no better. As mentioned above, Rose relies on *Middleton* and comment h of Restatement § 766 to support his claim that he cannot be liable for tortious interference unless his conduct "induced" the Southwest Board to breach the Standstill Agreement and terminate its business relationship with Southern Union. Although Rose acknowledges that Arizona follows the "but for" causation standard for tortious interference, he argues that Southern Union must prove that "the non-Southwest defendants *alone* caused or contributed to" the Board's decision to reject the Southern Union merger offer. (Rose's Mot. Summ. J. at 9).

*Middleton* does not establish or support Rose's theory. In *Middleton*, the court rejected interference liability because "it [was] very obvious that the affirmative, initiating and inducing action responsible for the assumed breach of the restrictive covenant originated with, and flowed from, the lessor, and not from the [defendants]." *Middleton*, 536 P.2d at 1076. *Middleton*'s focus on whether the defendant "induced" the lessor's breach, however, does not foreclose liability for *causing* a breach, but merely confirms that tort liability cannot be shown where the contracting party would have breached regardless of the defendant's conduct. In identifying the conduct of the breaching party that precluded a finding of liability for tortious interference on the facts before it, the court did not purport to define the conduct *necessary* for a finding of liability. Indeed, the court elsewhere noted that "the existence of affirmative, unduly persuasive, initiating conduct on the defendant's part in bringing about the breaching action *weigh[ed]*

*in favor of a finding of liability."* *Middleton,* 536 P.2d at 1076 (emphasis added). Ultimately, the court did not hold that the interference must originate with the defendant.

Restatement § 766 defines tortious interference as conduct "inducing or otherwise causing" a third party not to perform its contractual obligations. Comment h of section 766 explains the distinction between "inducing" and "otherwise causing," stating that the latter refers to situations in which a defendant physically prevents a party from performing its contractual obligations. Rose argues that because he neither induced the breach and termination—because Southwest was allegedly predisposed to do so—nor physically prevented Southwest from continuing its business relationship with Southern Union, he cannot, as a matter of law, be liable for tortious interference. This argument begs the question.

Comments o and k of § 766, however, provide further clarification of the causation element. First, "[t]he question whether the actor's conduct caused the third person to break his contract with the other raises an issue of fact." Restatement § 766 cmt. o. In addition, "[t]here is no technical requirement as to the kind of conduct that may result in interference with the third party's performance of the contract. The interference is *often* by inducement." *Id.* cmt. k (emphasis added). Finally, the elements of interference under Arizona law refer to conduct "inducing or causing a breach." *See, e.g., Antwerp Diamond Exchange,* 637 P.2d at 740. Arizona courts have not interpreted "inducing or causing" to be limited to situations in which a defendant either initiates interference or physically prevents a third party from performing its contractual obligations, but instead have relied on the "but for" causation standard. *See Megawatt Corp. v. Tucson Elec. Power Co.,* No. 86-173, 1989 WL 95602, at *8 (D.Ariz. May 26, 1989); *see also Caudle v. Bristow Optical Co.,* 224 F.3d 1014, 1024 (9th Cir.2000) (applying Arizona law and requiring plaintiff to show that defendant's conduct was "significant cause of her termination"); 45 Am.Jur.2d Interference § 10 (1999) ("To establish causation in a tortious interference action, the plaintiff must prove that the defendant's wrongful or unlawful conduct proximately caused the injury alleged, although it need not be the sole cause.").

■ In this case, it is by no means obvious that, absent Rose's and Irvin's alleged conduct, Southwest would have breached the Standstill Agreement and terminated its business relationship with Southern Union. First, Rose and Irvin allegedly involved themselves in the Southwest–ONEOK merger negotiations *before* Southern Union presented its merger offer to Southwest in February 1999. (*See* 7/4/99 Fisher Aff. ¶¶ 10–11). *Cf. Middleton,* 536 P.2d at 1076 (noting that defendant did not engage in allegedly interfering conduct until "the terminal stages of these inducing efforts by the lessor"). Additionally, there is evidence to show that Southwest Board members were favorably inclined toward the Southern Union offer, (*see* Southwest's SOF in Supp. of Mots. Summ. J. ¶ 36), but became concerned when presented with the information contained in the Irvin Letter and Irvin Phone Call and Governor Guinn's telephone call. (*See* 4/21/99 Maffie Depo. at 93; 7/4/99 Fisher Aff. ¶ 30; 6/7/01 Gerlacher Depo. at 111–12). This evidence gives rise to genuine issues of material fact regarding whether Rose's alleged conduct, together with Irvin's, Gaberino's, and Dubay's, caused Southwest to breach the Standstill Agreement and terminate its business relationship with Southern Union.

### 3. Dubay

Dubay argues that, in light of the Court's ruling that ONEOK cannot be liable for tortious interference with the Standstill Agreement as a matter of law, he is entitled to summary judgment on Counts Seven and Eight. Dubay contends that because he is an officer of ONEOK, he was not a stranger to the Standstill Agreement or business relationship between Southern Union and Southwest, and thus cannot be liable for tortious interference.[47]

With respect to Southern Union's claim for tortious interference with a business relationship, Dubay's arguments fail. First, Dubay argues that he is entitled to summary judgment because the "intracorporate conspiracy doctrine renders [Southern Union's] claim legally impossible." (Dubay's Mot. Summ. J. at 4). Second, Dubay argues that because the business relationship between Southern Union and Southwest was "coterminous" with their contractual relationship, Dubay was not a stranger to the business relationship and cannot be liable for interference with the relationship as a matter of law. (*Id.* at 6).

#### a. "intracorporate" conspiracy doctrine

Dubay points out that Southern Union alleges a "civil conspiracy among the defendants" to tortiously interfere with its business relationship with Southwest. (*Id.* at 4). According to Dubay, because he was acting in his corporate capacity, he is legally incapable of conspiring with ONEOK and, thus, cannot be liable for conspiring to interfere with Southern Union's business relationship with Southwest.

Dubay's reliance on the intracorporate conspiracy doctrine is unavailing. Southern Union alleges that Irvin, Rose, ONEOK, Dubay, and Gaberino worked *in concert* to interfere with Southern Union's business relationship with Southwest. Regardless of whether Dubay and ONEOK represent "a single legal actor" that cannot conspire with itself, Dubay/ONEOK *can* be liable for allegedly conspiring with Irvin and Rose. Thus, Southern Union's tortious interference claim against Dubay does not depend upon a conspiracy between Dubay and his employer, but involves an alleged conspiracy or concerted action among multiple defendants, including ONEOK and Dubay.

#### b. Dubay was a stranger to Southern Union's business relationship with Southwest

Dubay's argument that he cannot be liable for tortious interference with Southern Union's business relationship with Southwest because the business relationship was "coterminous" with their contractual relationship also fails. According to Dubay, "[t]his Court ... found that the business relationship and the contractual relationship are coterminous." (Dubay's Mot. Summ. J. at 6). "[J]ust as ONEOK and its agents and employees were not strangers to the contractual relationship, they are not strangers to the business relationship." (*Id.*).

■ Contrary to Dubay's assertion, the Court expressly distinguished the Southern Union–Southwest business relationship from the contractual relationship:

> ONEOK's status as a third party beneficiary shields it from liability only with respect to a claim of tortious interfer-

---

**47.** As already indicated, Southern Union concedes that in light of the Court's June 21, 2001 Order, it has no evidence to establish that Dubay, unlike ONEOK, was a stranger to the Standstill Agreement. (*See* 8/24/01 Hr'g

Tr. at 109). Accordingly, the Court found that Dubay is entitled to summary judgment on Southern Union's claim for tortious interference with contract (Count Eight).

ence with a contractual relationship, not a claim of tortious interference with a business relationship, because the business relationship allegedly interfered with extends far beyond the [Standstill] Agreement.

(6/21/01 Order at 35 n. 24). The Standstill Agreement was deliberately limited in scope, providing only for the exchange of confidential information and a good faith evaluation of Southern Union's merger offer. The parties expressly disclaimed any obligation to merge and any liability for failing to merge. (*See* Merger Agreement ¶ 10). The Standstill Agreement, however, was only one aspect of the Southern Union–Southwest business relationship, which also contemplated further negotiations and, ultimately, a consummated merger. Although Dubay and ONEOK were third party beneficiaries of the Standstill Agreement, they had no stake in a Southern Union–Southwest merger and were thus strangers to the business relationship that contemplated such a merger. Accordingly, Dubay, like ONEOK, can be liable for allegedly interfering with Southern Union's business relationship with Southwest.

### 4. Gaberino

In the two motions Gaberino filed, he argues that he is entitled to summary judgment on Counts Seven and Eight because, as acting general counsel for ONEOK, he cannot be liable for tortious interference as a matter of law. According to Gaberino, the Court's rulings with respect to ONEOK, Dioguardi, and Maffie are equally applicable to him. Gaberino argues that: (1) like Dioguardi, ONEOK's outside counsel, Gaberino was acting at all times within the scope of his employment as an attorney and cannot conspire with his client, ONEOK, as a matter of law; (2) like Maffie, Gaberino is an agent of his employer, ONEOK, and cannot tortiously interfere with a contract or relationship to which ONEOK is a party as a matter of

law; and (3) like ONEOK, Gaberino was not a stranger to the Standstill Agreement and could not interfere with Southern Union's contract or business relationship with Southwest as a matter of law.

### a. Gaberino's potential liability as a corporate officer

Southern Union argues that Gaberino cannot avoid liability simply by virtue of his status as an attorney. According to Southern Union, Gaberino, unlike Dioguardi, is also a corporate officer of ONEOK and is personally liable for his alleged interference with the business relationship between Southern Union and Southwest. Specifically, Southern Union alleges that Gaberino was actively involved with Irvin and Rose in drafting and circulating the Irvin Letter and encouraging Governor Guinn's telephone call to the Southwest Board. (*See* Southern Union's Resp. at 8) (citing, *inter alia*, 5/10/00 Gaberino Depo. at 274, 280, 284–85 & 5/9/00 Gaberino Depo. at 129). Southern Union argues that Gaberino actively participated in a conspiracy and in concert with Irvin, Rose, and others to interfere with Southern Union's business relationship with Southwest.

Gaberino acknowledges that his situation differs from Dioguardi because Dioguardi was outside counsel to ONEOK, while Gaberino was in-house counsel. Gaberino argues that this is a "distinction without a difference," however, and only strengthens the rationale for the conclusion that he could not have conspired with his client/employer as a matter of law. (Gaberino's Mot. for Summ. J. at 2). Further, Gaberino argues that the evidence presented by Southern Union establishes that his alleged involvement in the Irvin Letter and other acts of alleged interference was even less substantial than Dioguardi's alleged interference. (*See* Gaberino's Reply at 3).

The Court's rulings with respect to Dioguardi, however, have no application to Gaberino. As an initial matter, the Court's ruling that Dioguardi was entitled to summary judgment depended not on the degree of his involvement in the allegedly interfering conduct, but on his status as ONEOK's attorney. (*See* 6/21/01 Order at 1–4). Thus, Gaberino's claim that he is entitled to summary judgment because his involvement was less substantial than Dioguardi's has no merit. Southern Union's argument is that Gaberino, as a *corporate officer*, conspired with Irvin and Rose to interfere with Southern Union's business relationship with Southwest, not that *attorney* Gaberino conspired with ONEOK, his client. (*See* Opp'n at 5).[48]

With respect to Gaberino's liability as an individual, under Arizona law, corporate officers may be individually liable for tortious conduct "even though the wrongful act is performed in the name of the corporation." *Jabczenski v. Southern Pac. Mem. Hosps., Inc.*, 119 Ariz. 15, 579 P.2d 53, 58 (App.1978). "To be held liable, the directors must participate or have knowledge amounting to acquiescence or be guilty of negligence in the management and supervision of the corporate affairs contributing to the injury." *Id.* Southern Union contends that Gaberino actively and intentionally participated in a conspiracy to tortiously interfere with Southern Union's contract. (*See* Opp'n at 6–9). There are thus genuine issues of material fact concerning Gaberino's role in the alleged interference.

### b. Gaberino was a stranger to Southern Union's business relationship with Southwest

Gaberino's argument that he, like Maffie, was not a stranger to the business relationship between Southern Union and Southwest also fails. As discussed in the context of Dubay's Motion, the contractual relationship between Southern Union and Southwest was not coterminous with the parties' business relationship. Although Southern Union concedes that it cannot establish that Gaberino was a stranger to the Standstill Agreement (Count Eight),[49] Gaberino, like ONEOK and Dubay, *was* a stranger to the business relationship between Southern Union and Southwest. Maffie, by contrast, was a party to both the Standstill Agreement and the business relationship between Southern Union and Southwest because he was President and Chief Executive Officer of Southwest. (*See* 6/21/01 Order at 36). Thus, Gaberino can be liable for tortiously interfering with Southern Union's business relationship with Southwest.

## V. SOUTHERN UNION'S MOTION TO STRIKE EXPERT REPORTS AND SUMMARILY DENY SUMMARY JUDGMENT MOTIONS OF SOUTHWEST AND MAFFIE

### A. Southern Union's Motion to Strike Expert Reports of Southwest

On August 2, 2001, Southern Union filed a Motion to Strike Expert Reports of Southwest ("Motion to Strike") (Doc. # 1247–1). Southern moves the Court, pursuant to Fed.R.Civ.P. 37, to strike the reports of Mr. William Cockrum, Dr. Bradford Cornell, and Dr. Lawrence Kolbe based on Southwest's alleged failure to produce documents to Southern Union that the experts apparently relied on in preparing their reports. (Mot. at 2, 9). In its September 26, 2001 Order, the Court denied Southern Union's Motion to Strike.

---

**48.** Notably, Southern Union has not raised the argument that Dioguardi conspired with Irvin and Rose.

**49.** *See* 8/24/01 Hr'g Tr. at 109.

### 1. The parties' papers

In its Motion to Strike, Southern Union claims that Southwest "withheld approximately 350 pages of documents from Southern Union under claim of privilege, while at the same time making those very same documents available for its experts to review, comment upon, and base their opinions upon." (*Id.* at 9).[50] Southern Union argues that Southwest's alleged failure to disclose the documents, as required by Fed.R.Civ.P. 26(a)(1)(B), impeded Southern Union's ability to "have a level playing field with expert reports" and that striking the reports is an appropriate sanction given Southwest's history of disclosure abuse. (*Id.* at 8–14, 9 n. 2).

In its Opposition, Southwest contends that, with the exception of a two-page non-privileged letter that has no bearing on this matter, it did not provide its experts with any privileged or undisclosed documents. (Opp'n at 2–3). With the exception of the two-page letter, Southwest claims that Southern Union received "all of the documents listed in Exhibit G, under these or different Bates numbers." (*Id.* at 6).[51] Southwest then addresses each document in turn and explains why Southern Union is wrong. (*Id.* at 7–10). Finally, Southwest argues that the "draconian remedy" sought by Southern Union is inappropriate because the documents that Southern Union complains about did not bear on Southern Union's ability to cross-examine the experts and because Southwest does not have a "history of disclosure abuse"

and has not failed to comply with any Court order. (*Id.* at 11–12).

In its Reply, Southern Union sets forth each of Southwest's arguments, as Southern Union reads them, and then replies to each argument. In short, Southern Union argues: (1) that whether or not Southwest's experts actually relied on the documents, they said they did in their reports; (2) that although Southern Union may have the documents in another form, it is impossible for Southern Union to know that; and (3) that some of the documents are still missing from Southwest's production. (Reply at 6–9).

### 2. The duty to disclose under Fed. R.Civ.P. 26

Fed.R.Civ.P. 26(a)(1) requires parties to disclose to all other parties "a copy of . . . all documents, data compilations, and tangible things . . . that the disclosing party may use to support its claims or defenses." Fed.R.Civ.P. 26(a)(1)(B). Similarly, Rule 26(a)(2) requires parties to disclose expert reports prepared and signed by the expert witness that shall contain, among other things, "the data or other information *considered* by the witness in forming the opinions." Fed.R.Civ.P. 26(a)(2)(B) (emphasis added). As the Advisory Committee Notes to Rule 26(a)(2) make clear:

> Given this obligation of disclosure, litigants should no longer be able to argue that materials furnished to their experts to be used in forming their opinions—whether or not ultimately relied upon by

**50.** Southern Union identifies the 16 allegedly withheld documents in "Exhibit G" to its motion. Documents 1–13, which Southwest calls "Category 1" documents, are documents allegedly not produced to Southern Union but referred to by either Mr. Cockrum or Dr. Kolbe. Documents 14–16, which Southwest calls "Category 2" documents, are documents allegedly not produced to Southern Union on grounds of privilege but referred to by either

Mr. Cockrum or Dr. Cornell. (Mot. Ex. G; Opp'n at 6).

**51.** Southwest also claims that, "[a]s a courtesy to the parties," it "delivered copies of all documents with the Bates numbers listed in Exhibit G, except the privileged documents, to Southern Union and the other parties at the August 14, 2001, deposition of Lawrence Kolbe." (Opp'n at 6 n. 5).

the expert—are privileged or otherwise protected from disclosure when such persons are testifying or being deposed. Fed.R.Civ.P. 26 Advisory Committee Notes, 1993 Amendments; *see Haworth v. Herman Miller, Inc.,* 162 F.R.D. 289, 295 (W.D.Mich.1995) (noting that Rule 26(a)(2) requires disclosure of all factual information expert considered, including information considered but not relied on).

Thus, the Court finds that Southwest should have timely produced all documents that its expert witnesses *considered* even if the experts did not ultimately *rely on* the documents in forming their opinions. To the extent Southwest has not already produced such documents or information to the other parties in the form identified by Southwest's experts in their reports, Southwest shall do so within 10 days from the date of this opinion. As discussed below, however, the Court does not find that the reports of Southwest's experts should be stricken as a sanction for Southwest's failure to timely produce the documents in question.

### 3. Sanctions for non-disclosure under Fed.R.Civ.P. 37

Fed.R.Civ.P. 37(c) provides, in pertinent part:

A party that without substantial justification fails to disclose information required by Rule 26(a) ... is not, *unless such failure is harmless,* permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose *other appropriate sanctions* [such as] payment of reasonable expenses, including attorney's fees, caused by the failure[.]

Fed.R.Civ.P. 37(c)(1) (emphasis added). As the Advisory Committee Notes to Rule 37(c) explain, limiting the preclusion sanction to "violations 'without substantial justification, coupled with the exception for violations that are 'harmless,' is needed to avoid unduly harsh penalties in a variety of situations.'" Fed.R.Civ.P. 37 Advisory Committee Notes, 1993 Amendments.

The Court has "broad discretion to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial." *Campbell Indus. v. M/V Gemini,* 619 F.2d 24, 27 (9th Cir.1980). This discretion includes the discretion to admit as well as to exclude expert testimony. *See Jenkins v. Whittaker,* 785 F.2d 720, 728 (9th Cir.), *cert. denied,* 479 U.S. 918, 107 S.Ct. 324, 93 L.Ed.2d 296 (1986). The Advisory Committee Notes to Fed.R.Civ.P. 26(a)(2) are instructive for the Court's decision whether to exercise its broad discretion and strike the challenged expert reports. The notes explain that Rule 26(a)(2) "imposes an additional duty to disclose information regarding expert testimony *sufficiently in advance of trial* that opposing parties have a *reasonable opportunity* to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." Fed.R.Civ.P. 26 Advisory Committee Notes, 1993 Amendments (emphasis added).

In its Scheduling Order dated September 19, 2001 (Doc. # 1369), the Court scheduled a three-month trial beginning on May 28, 2002—more than eight months after the Court considered and made its ruling denying Southern Union's Motion to Strike. (*See* 9/26/01 Order).[52] Thus, be-

---

52. At the November 28, 2001 *Daubert* hearing, the Court vacated the May 28, 2002 trial date and stated that it would reschedule the trial once the Court resolves all outstanding discovery disputes and sets the briefing schedule for the final motions for summary judgment.

cause the trial was scheduled to begin in late May 2002, the Court denied Southern Union's Motion to Strike because the Court found that any harm Southern Union may have suffered due to Southwest's failure to produce all documents considered by their experts could be cured by requiring Southwest to produce such documents and allowing Southern Union to re-depose the experts and arrange for other expert testimony, if necessary. *See* Fed. R.Civ.P. 37(c)(1); *see also, e.g., Reed v. Binder,* 165 F.R.D. 424, 431 (D.N.J.1996) (noting that barring experts' testimony would be unduly harsh under circumstances of case); *McNerney v. Archer Daniels Midland Co.,* 164 F.R.D. 584, 587 (W.D.N.Y.1995) (denying defendant's motion to preclude, but allowing defendant to depose plaintiff's expert and apply to court for award of reasonable expenses and attorneys' fees). To the extent Southern Union, after having an opportunity to review any non-produced documents considered by Southwest's experts, needs to re-depose Mr. Cockrum, Dr. Cornell, and/or Dr. Kolbe to cure harm caused by the nonproduction, Southwest shall make the expert(s) available to Southern Union. In addition, Southwest shall pay Southern Union, after Southern has made efforts to mitigate the costs and fees, all reasonably necessary costs, including the expert's and attorneys' fees, associated with any such depositions. *See* Fed.R.Civ.P. 37(c)(1); *see also, e.g., Old Country Toyota v. Toyota Motor Distribs.,* 168 F.R.D. 134, 137 (W.D.N.Y.1996) (requiring noncomplying party to pay costs of deposition, including expert's and attorneys' fees).

The parties are reminded that, pursuant to the Rules of Practice of the United States District Court for the District of Arizona, Rule 1.10(j), parties are not to file discovery motions without first meeting to resolve the conflict. Thus, the parties shall meet and engage their best efforts to arrange any necessary depositions of Southwest's experts without the Court's intervention. If that meeting is unsuccessful, the parties are to arrange a telephone conference with the Court in lieu of filing a formal motion. Similarly, the parties shall make their best efforts to agree to the reasonable costs and attorneys' fees associated with any such depositions. If any depositions are necessary, Southern Union shall apply to the Court for an award of reasonable costs and fees associated with the depositions after meeting and conferring with Southwest.

## B. Southern Union's Motion to Summarily Deny Summary Judgment Motions of Southwest and Maffie

Southern Union filed a Motion to Summarily Deny Summary Judgment Motions of Southwest Gas and Maffie (Doc. # 1247–2) pursuant to Fed.R.Civ.P. 37(c)(1). Southern Union argues that Southwest's and Maffie's Motions should be dismissed because Southwest and Maffie have "engaged in a pattern of delayed production of key documents." (Mot. at 10). According to Southern Union, these Defendants have failed to timely disclose relevant notes and documents without explicit Court orders to do so. (*Id.*). In addition, Southern Union cites numerous examples of alleged discovery abuses by Southwest and Maffie. (*Id.* at 10–14).

Southwest and Maffie argue that they have not committed the discovery abuses alleged by Southern Union. In any case, they argue that the extreme sanction of summarily denying summary judgment is unwarranted because the "wrongs" of which Southern Union complains are unrelated to Southwest's and Maffie's summary judgment motions. (Southwest's Opp'n at 11). Thus, if the Court *were* to identify a discovery abuse, it should adopt a proportionate sanction, not a blanket rejection of

the Defendants' motions. (Maffie's Opp'n at 6–7).

 The Court has broad discretion to sanction litigants for discovery abuses. *See* Fed.R.Civ.P. 37; *see also United States v. Kahaluu Const. Co.*, 857 F.2d 600, 602 (9th Cir.1988) (sanctions pursuant to Rule 37); *Unigard Sec. Ins. Co. v. Lakewood Eng. & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir.1992) (sanctions pursuant to Court's inherent power). Extreme sanctions, however, such as striking pleadings or terminating the litigation by dismissal or default, are reserved for extreme circumstances. *See In re Exxon Valdez*, 102 F.3d 429, 432 (9th Cir.1996) (identifying willfulness and bad faith as bases for extreme sanctions). The absence of substantial prejudice resulting from discovery abuses and the availability of less drastic sanctions militate against the imposition of severe sanctions. *See Wanderer v. Johnston*, 910 F.2d 652, 656 (9th Cir.1990).

In this case, Southern Union has not established that Southwest's and Maffie's alleged discovery abuses are sufficiently egregious to warrant motion-dispositive sanctions. In particular, Southern Union has not shown that it was prejudiced in opposing the Defendants' summary judgment motions as a result of the Defendants' alleged discovery abuses. In addition, less extreme sanctions, including the imposition of expenses incurred, are readily available, and are better addressed in the context of the parties' outstanding discovery disputes.